Charles L. FEATHERS t/a Feather Trucking; Thomas V. Patterson; Lawton Trucking, Inc.; D.P. Zimmerman, Jr.; Michael D. Rose; David B. Smoygi; Donald Benyack; Ruth A. Cordes, Adm. Est. Edward Cordes, Jr.; Everett C. Teeter, Jr., t/a Everett C. Teeter Trucking; William Nileski and Robert C. Ermin, Plaintiffs,

v.

UNITED MINE WORKERS OF AMERICA and District 2, United Mine Workers of America, and Local 1600, United Mine Workers of America, Defendants.

Civ. A. No. 76–955.

United States District Court, W.D. Pennsylvania, Civil Division.

Oct. 21, 1985.

Paul Hirschfield, Pittsburgh, Pa., Luther Weaver, Howard K. Trubman, Herbert L. Olivieri, Philadelphia, Pa., for plaintiff.

Michael Holland, Kurt Kobelt, United Mine Workers of America, Washington, D.C., Melvin P. Stein, Pittsburgh, Pa., for defendants.

## OPINION

SIMMONS, District Judge.

### I. INTRODUCTION

This action was originally filed on July 23, 1976, as a class action by eleven West-

ern Pennsylvania coal haulers against the Defendants United Mine Workers of America [UMWA], District 2 of the United Mine Workers of America, and Local 1600 of the United Mine Workers of America [hereinafter collectively referred to as "Defendant" or "Defendant Union"]. The Plaintiffs sought to recover damages resulting from the Union's attempts to force them to sign the 1974 National Bituminous Coal Wage Agreement [hereinafter referred to as the "NBCWA" or the "Wage Agreement"] and to prevent the Bituminous Coal Operator's Association [hereinafter "BCOA"] from using non-signatory haulers to transport coal. Count One of the Complaint, brought under section 303 of the National Labor Relations Act (NLRA), 29 U.S.C. § 187, alleged that the Union violated sections 8(b)(4) and 8(e) of the Labor Act, 29 U.S.C. §§ 158(b)(4) and (e), because Article II(g) of the 1974 Wage Agreement contained an unlawful hot cargo clause.[1] Specifically, the Plaintiffs claimed that the Defendant Union engaged in an illegal strike to compel them to sign a collective bargaining agreement with the United Mine Workers of America, by using a hot cargo clause in the contract with the BCOA, which prevented the BCOA from subcontracting with coal haulers, such as Plaintiffs, who failed to sign the 1974 Wage Agreement. Plaintiffs alleged that the use of Article II(g) by the Union caused a secondary boycott of the coal haulers. Counts Two and Three of the Complaint charged that the Union violated the federal antitrust laws.

On September 13, 1977, the above-captioned case was certified as a class action under Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, and the class was defined to include: "All coal haulers whose principal place of business was or is now located in Western Pennsylvania who, at any time from on or about November 1, 1974, have been engaged in the business of coal hauling from points in Western Pennsylvania to locations in Western Pennsylvania and other locations in the United States. *Feather v. United Mine Workers of America,* 494 F.Supp. 701, 704 (W.D.Pa. 1980).

This case was originally assigned to the late Judge William Knox of this Court, who conducted a bench trial on the liability issues, and in an opinion dated June 27, 1980, found the Union to be liable as to Count 1, but found them to be exempt from liability as to Counts 2 and 3. The matter was then referred to the United States Magistrate for a calculation of damages. The case was reassigned to this Judge after the death of Judge Knox, and this Judge adopted the recommendations of the Magistrate with respect to damages in an Order dated June 23, 1982. Both sides then appealed, and on June 30, 1983, the United States Court of Appeals for the Third Circuit affirmed the district court's conclusion that the Union was exempt from liability under the antitrust laws, and also affirmed the Union's section 8(b)(4) liability for the period of the BCOA strike, but vacated the damage award and remanded for additional findings of fact on the issue of causation.[2]

Our affirmance of the Union's section 8(b)(4) liability for the period of the BCOA strike does not mandate a conclusion that the plaintiffs are entitled to recover damages under section 303 for all losses that might be attributable to that strike, regardless of causation. Section 303(a) makes it unlawful for a labor union to violate section 8(b)(4), 29 U.S.C. § 187(a). *See Local 20, Teamsters Union v. Morton,* 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). When a union strikes, and one purpose of that strike is to obtain or enforce a hot cargo agreement, sections 8(b)(4) and 303(a) are violated. *National Labor Relations Board v. Denver Building & Construc-*

---

1. Generally, a "hot cargo" agreement applies pressure on an employer, directly or indirectly, to require him to cease doing business with a third party in order to persuade the third party to accede to the Union's objectives. *See Lewis v. Seanor Coal Co.,* 382 F.2d 437, 440 (3d Cir.1967).

2. The matter was previously referred to a Special Master for disposition of the causation and agency issues, as well as for a determination of the damage claims, but that Special Master died before the issues could be determined; thus the matter is once again pending before this Court.

*tion Trades Council,* 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). In a companion case to [*Denver Building & Construction* ], the Court stressed that "it was sufficient that *an* objective of the picketing, although *not necessarily the only* objective of the picketing, was to force [the employer] to ... cease doing business with [another employee]." 341 U.S. at 700, 71 S.Ct. at 957. In the case before us, Article II(g) of the 1974 NBCWA was a hot cargo clause, and one of the objectives of the BCOA strike was to seek agreement on that clause. Therefore, by engaging in that strike, the UMWA violated section 303(a):

*Feather v. United Mine Workers of America,* 711 F.2d 530, 537 (3d Cir.1983).

The Court of Appeals went on to say with respect to the issue of the causation requirement of section 303(b):

> To receive a damage award under [section 303], the plaintiffs in this case must demonstrate not that the unlawful hot cargo clause was *an* object of the BCOA strike, but that it was a *substantial factor* in or *materially contributed* to the Union's decision to call and maintain that strike. The mere fact that the agreement the Union sought to obtain by striking contained a hot cargo clause is not enough, without more, to support a finding that the clause was a substantial factor.
>
> The prior opinions in this case have not resolved this issue. The district court's liability opinion is confined to a discussion of sections 8(b)(4) and 303(a). It contains no determination of the proximate cause issue presented by the section 303(b) damage claim.

711 F.2d at 538.

The Court directed that the matter be considered de novo, and that additional evi-

dence be taken if necessary. The parties have deposed Richard Banks, who had previously testified as a witness for the Defendants at the non jury trial on liability. The issue presently before this Court is whether Article II(g) of the 1974 NBCWA was a substantial factor in, or materially contributed to the Union's decision to call and maintain the BCOA strike.[3]

The clause in the 1974 Wage Agreement which was previously found by the district court to be an illegal hot cargo clause provides as follows:

Article II: *Scope and Coverage*

Section (g)—*Contracting and Subcontracting.*

(1) *Transportation of Coal* —The transportation of coal as defined in paragraph (a) may be contracted out only to a contractor employing members of the UMWA under this Agreement and only where contracting out such work is consistent with prior practice and custom of the employer.

(2) *Repair and Maintenance Work* —Repair and maintenance work customarily performed by classified employees at the mine or central shop shall not be contracted out except (a) where the work is being performed by a manufacturer or supplier under warranty or (b) where the employer does not have the available equipment or regular employees with necessary skills available to perform the work at the mine or central shop, provided, however, that the work at the mine or central shop shall be performed by UMWA members to the extent and in the manner permitted by law.

The relevant statutory provisions are contained in 29 U.S.C. §§ 158 and 187. 29 U.S.C. § 158 provides in relevant part:

> The parties have agreed to refer the above-captioned case to a Special Master to resolve the damage claims, and the Special Master will decide the remaining agency issue as well as presiding over the trial of the damage claims of the class. The matter of selection of the Special Master and the Order of Reference will be considered at a later date, after this Opinion and Order have been entered.

**3.** With respect to the H & H damage award, the Court of Appeals held that there was no finding that the UMWA authorized or supported the individuals who threatened the Hannas, and on that basis, none of the Union entities could be held responsible absent a separate showing of agency as to each Defendant. The matter was remanded to this Court for the determination of the agency issue. 711 F.2d at 539.

(b) It shall be an unfair labor practice for a labor organization or its agents—

.     .     .     .     .

4(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by section 8(e) [subsec. (e) of this section];

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9 [29 U.S.C. § 159]: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

.     .     .     .     .

29 U.S.C. § 158(b)(4).

29 U.S.C. § 187 provides:

§ 187. Unlawful activities of labor union—Right of action for injury.

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 8(b)(4) of the National Labor Relations Act, as amended [29 U.S.C. § 158(b)(4)].

(b) Whoever shall be injured in his business or property by reason or [of] any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 301 hereof [29 U.S.C. § 185] without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

## II. APPLICABLE LAW

In its June 30, 1983 opinion, the Third Circuit determined that the prior district court opinion contained no determination of the proximate cause issue presented by the section 303(b) damage claim, vacated the damage award, and then remanded the case to this Court for a specific finding on the issue of causation during the period of the BCOA strike and a determination of the agency question with respect to the Magistrate's recommendation relating to the H & H damage award.

Section 303(b) of the National Labor Relations Act requires that there be a causal nexus between the unlawful secondary activity and the injury suffered by the Plaintiff. The Third Circuit, in *Feather v. United Mine Workers, supra,* has determined that the causal requirement as articulated by the Ninth Circuit in *Mead v. Retail Clerks International Association,* 523 F.2d 1371 (9th Cir.1975), is the proper standard to be used in determining the proximate cause issue presented by a section 303(b) damage claim. In *Mead, supra,* the Union had proposed that an agreement between the Union and grocery stores contain a "demonstrator clause" which provided that food demonstrators who distributed product samples to customers must be covered by the collective bargaining agreement whether or not the demonstrators were employed by the grocery store or by the supplier of the product being promoted. When the grocery store owner rejected the proposed contract and objected to the dem-

onstrator clause as well as the wage, health and welfare benefits and pension provisions, the Union called a strike and began picketing.

The *Mead* Court held that under section 303, injury occurs "by reason of" particular unlawful conduct if that conduct materially contributes to the injury or is a substantial factor in bringing it about, 523 F.2d at 1376, and stated as follows:

> Nor were the Meads required to establish the fact of resultant injury to their business with certainty. "Regarding the quantum of proof required to establish the fact of damage, the rule is that the plaintiff is required to establish with reasonable probability the existence of some causal connection between the defendant's wrongful act and some loss of anticipated revenue." [Citations omitted]. It is sufficient if the evidence "support[ed] a just and reasonable inference that [the Mead's] were damaged by [the Union's] action." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 266, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946).

523 F.2d at 1377.

### III. REVIEW OF THE EVIDENCE

A thorough review of the record indicates that prior to 1974 the NBCWA did not contain a work jurisdiction clause, and that work jurisdiction was a prime concern of the Defendants throughout the history of the negotiations between the UMWA and the BCOA. The two issues of work jurisdiction and subcontracting were treated as similar objectives by the UMWA throughout the negotiations, and the record clearly indicates that the UMWA strongly bargained for Article II(g) so that it could expand both the subject matter jurisdiction of the Union as well as the number of its members. When the UMWA was unable to obtain what it considered to be an acceptable form of Article II(g) prior to the expiration of the 1971 Wage Agreement, the strike against the BCOA began. This Court's review of the record reveals the following relevant information with respect to the history of the negotiations between the parties.

In 1973 and 1974, a series of district collective bargaining conferences was held to familiarize district representatives with the 1971 Wage Agreement, and to solicit information, feedback and recommendations for the negotiation of the 1974 collective bargaining agreement. Tom Bethell, a UMWA official, submitted a confidential memorandum to the UMWA on June 14, 1974, in which he reported on the concerns that had been expressed to him in the district collective bargaining conferences. With respect to non-economic concerns, Mr. Bethell reported as follows:

> In non-economic areas, the greatest concerns not suprisingly focus on seniority and the grievance procedure. Again, detailed summaries available next week will be more helpful than a simplification here; however, there are generally very strong feelings on the need to determine seniority on length of service alone, with no continuation of "qualifications;" district-wide or company-wide seniority; elimination of subcontracting, especially maintenance and contract haulage; ...

P.Ex. 6, p. 2. Thus, as early as June of 1974, the elimination of subcontracting was seen as an important objective of the collective bargaining process.

The UMWA issued its proposals to the Bituminous Coal Industry prior to the 1974 collective bargaining sessions, which proposals constitute Plaintiffs' Exhibit 8. In the *Scope and Coverage* section of that proposal, the UMWA stated:

SCOPE AND COVERAGE

> With the possible exception of Article XIII (Seniority), there is probably no other article in the current agreement which has caused more problems, more disputes, more work stoppages and more rank-and-file discontent than Article II. It is a literal mine field of explosive issues. It is confusing to the miner and to mine management. It says too much in some sections, too little in others. It is out-of-date in some areas, and is not

designed to remedy critical issues which regularly arise.

P.Ex. 8, p. 24/1.

With respect to subleasing and contracting, the proposal stated:

> During the term of the present agreement, the jurisdictional rights of the UMWA have repeatedly been infringed upon and undermined by the subcontracting of work. Because of serious problems which may result in any attempt to limit subcontracting, other than to impose an absolute ban on subcontracting, the UMWA proposes that subcontracting of unit work be absolutely prohibited. Furthermore, the Union reserves the right to resort to free collective bargaining when any employer attempts to evade the prohibition on subcontracting.

P.Ex. 8, p. 24/5.

The UMWA also sought to expand its work jurisdiction:

> Section (f) is entirely inadequate to cover the existing jurisdiction of the UMWA. It does not deal with problems which have regularly recurred during the term of the 1971 agreement such as the trucking of coal from mine sites, the removal of overburden and reclamation of strip sites and the maintenance of mine roads. This section should be redrafted in its entirety to make it clear that all work related to or incident to the removal of coal from the earth, its processing, the hauling of coal from the mine site, the removal of coal waste and maintenance of gob piles, the restoration and reclamation of the mine site, the maintenance of mine roads, and all repair and maintenance work in and around the mine or at a central repair shop shall be performed solely by members of the UMWA employed by the mine owner or operator.

P.Ex. 8 p. 24/6.

It is evident that from the beginning of the negotiations the UMWA wished to expand its work jurisdiction and eliminate all subcontracting by non-union personnel. The district conferences had previously recommended that the jurisdiction clause be amended to cover independent truckers.

(P.Ex. 7, 9). At a September 10, 1974 bargaining session, William Hartman of the BCOA brought up the question of subleasing, subcontracting and work jurisdiction. The notes of this main table session reflect the following exchange between William Hartman (WH), Guy Farmer (GF), and Walter Wallace (WW) of the BCOA, and Rick Bank (RB) and Chip Yablonski (JY) of the UMWA:

> WH: Subleasing and Subcontracting and Work Jurisdiction are pretty much the same thing. We've contracted trucking historically. How would that be viewed under your proposal?
>
> JY: It would be included in our jurisdiction.
>
> .    .    .    .    .
>
> WH: Can you say that the applicability of the subcontracting clause would be selective?
>
> JY: We'd start from a blanket position and hear your objections and ideas.
>
> GF: This would prevent independent contract hauling?
>
> RB: Yes.

P.Ex. 9A, Notes of Main Table Session.

The issue of subleasing and subcontracting was a hotly contested issue throughout the negotiations, and had not been resolved prior to the time the 1971 Wage Agreement expired. In a November 10, 1974 memo prepared by the International Bargaining Counsel, the UMWA noted that there were areas of disagreement in Article II, Sections (a) and (g), many of which were critical to reaching final agreement. The UMWA found Article II(g) as proposed to be unacceptable, because the BCOA proposal placed no limitations on subcontracting practices. P.Ex. 19; Ex. 16 of Docket Entry No. 83.

At the 40th Collective Bargaining Session of Sunday, November 10, 1974, Chip Yablonski of the UMWA indicated that there was substantial disagreement in the area of subcontracting. (Ex. 17) The UMWA proposed that the following language be adopted:

Section (g) Subcontracting of Classified Work

Except as expressly provided herein, the Employer shall not, during the term of this Agreement, contract out any work covered by this Agreement:

(1) An Employer may continue existing arrangements with trucking companies or operators or other transportation companies who presently provide haulage services provided that the labor costs of such contractors, including both hourly rates and fringe benefit payments to their employees, are not less than those required by this Agreement, and, in the manner and to the extent permitted by law, are members of the UMWA covered by this Agreement.

P.Ex. 21; Ex. 18 of Docket Entry No. 83.

At the 41st Collective Bargaining Session of November 11, 1974, the BCOA had proposed language limited to trucking operations. The UMWA wanted to encompass modes of transporting coal and said that trucking was not the only method of transporting coal. It is clear, then, that on the eve of the strike, there was still no agreement with respect to the contents of Article II(g). The UMWA constitutional policy of "No contract, no work", meant that when the 1971 NBCWA expired on November 12, 1974, the UMWA authorized the cessation of work of all of its members working at any mine and for any coal hauler who did not have a collective bargaining agreement with the UMWA.

The parties continued to discuss proposed language concerning Article II(g) on November 13, 1974, after the strike had started. At this time, the UMWA made the following proposal regarding Article II(g):

Section (g) Contracting and Subcontracting

(1) Haulage of Coal—The haulage of coal may be contracted out only to a contractor employing members of the UMWA under this Agreement and where contracting out such work is consistent with the prior custom and practice of the Employer.

P.Ex. 23; Ex. 20 of Docket Entry No. 83.

The BCOA proposed language dealing with the transportation of coal rather than the haulage of coal:

(1) Transportation of Coal—the transportation of coal as defined in paragraph (a) may be contracted out only to a contractor employing members of the UMWA under this Agreement and only where contracting out such work is consistent with the prior custom and practice of the Employer.

When the UMWA International Bargaining Council met on November 14, 1974, the importance of Article II was discussed:

I think that the first two Articles, Enabling Clause and Scope and Coverage, where there was a fight—and I mean a real dog fight—over each word, each word that went into that contract—because each word that went in there, it meant something that we took away from the coal operators and the management of the mines.

Harry Patrick Remarks, Nov. 14, 1974, P.Ex. 26; Ex. 60 of Docket Entry No. 83 at 5.

Mike Trbovich, a UMWA Vice President, stated:

I think, you know, when you look at this contract and you look at the Enabling Clause and you look at the Scope and Coverage, I know that there's thousands of people in our Union, even some officers and I wasn't too educated on this—on these two articles, but these are the two most important articles in this contract.

These articles protect the United Mine Workers and I think that Chip just explained to you the Enabling Clause. And after negotiating over there for days, and arguing with coal operators, I got an education on it and this is why I say that these are the most two important articles in this contract, to protect our jurisdiction and to protect our Union, as Chip has said.

P.Ex. 26 at 280; Ex. 60 of Docket Entry No. 83.

Chip Yablonski reported with respect to Article II:

We faced this thing in terms of trying to do two things: trying to recapture work that had previously been farmed out, without trying to wreck the industry and without trying to dislocate the industry; but trying to prevent abuses, particularly in the subcontracting areas.

It is very difficult to write limitations on subcontracting, as a matter of fact, without violating the hot cargo provisions of the National Labor Relations Act, to draft anything in this area without having jurisdiction clearly defined.

.     .     .     .     .

A major issue, and I think with all that went on here in the Executive Board over subcontracting out, and removal of overburden, I feel pretty good to say that that is clearly defined as work that is within our jurisdiction.

P.Ex. 26 at 280–82; Ex. 60 of Docket Entry No. 83.

Because the BCOA and the UMWA failed to reach a contract before the 1971 agreement expired at midnight on November 11, 1974, the Defendants immediately began a work stoppage on November 12, 1974, and picketed all coal producing facilities, and as a result, coal haulers were unable to conduct their business as all coal production ceased.

### IV. FINDINGS OF FACT

1. The Plaintiffs are individuals, partnerships, and corporations, who, at any time from on or about November 1, 1974, have been engaged in the business of coal hauling from locations in Western Pennsylvania to places within and without Western Pennsylvania. The geographical area of Western Pennsylvania is comprised of the 40 western-most counties of the Commonwealth. The principal place of business of the estimated 1,000 Plaintiffs is located in this geographical area.

2. Defendants, United Mine Workers of America (UMWA), District No. 2 of the UMWA, and Local Union No. 1600 of the UMWA are unincorporated associations and labor organizations within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5). Defendants represent employees who haul coal and work in and around coal mines.

3. The primary function of the UMWA is to periodically negotiate agreements on behalf of its members regarding wages, hours and conditions of employment. For more than twenty years, the UMWA has engaged in collective bargaining with a multi-employer bargaining unit, the Bituminous Coal Operator's Association (BCOA). The collective bargaining agreement negotiated from time to time between the BCOA and the UMWA is known as the National Bituminous Coal Wage Agreement (NBCWA). The NBCWA is a master collective bargaining agreement. Although the BCOA negotiates the contract, the Association neither administers nor executes its terms on behalf of its members.

4. Prior to 1974, the NBCWA had not contained an express work jurisdiction clause which defined the overall scope of the UMWA jurisdiction. (See the 1968 NBCWA [D.Ex. H], and the 1974 NBCWA [P.Ex.2]).

5. In anticipation of the expiration of the 1971 NBCWA on November 12, 1974, the UMWA began preparations for the negotiations of the successor agreement. During the spring of 1974, thirteen district collective bargaining conferences involving nine hundred locally elected delegates from local unions in nineteen UMWA districts were held. At these conferences, UMWA officials solicited recommendations for the 1974 NBCWA.

6. The elimination of subcontracting of the hauling of coal by truck to non-union coal haulers was one of the prime goals of the Defendants in the negotiations of the 1974 NBCWA. The UMWA district conferences recommended that the work jurisdiction clause of the NBCWA should be amended "to cover independent truckers."

7. On September 3, 1974, the formal bargaining process commenced. At the first session, the UMWA presented the BCOA with a grey-bound volume of policy statements and proposals. In the *Scope and Coverage* section of that proposal, the UMWA stated:

SCOPE AND COVERAGE

With the possible exception of Article XIII (Seniority), there is probably no other article in the current agreement which has caused more problems, more disputes, more work stoppages and more rank-and-file discontent than Article II. It is a literal mine field of explosive issues. It is confusing to the miner and to mine management. It says too much in some sections, too little in others. It is out-of-date in some areas, and is not designed to remedy critical issues which regularly arise.

P.Ex. 8, p. 24/1.

With respect to Subleasing and Contracting, the UMWA proposed that subcontracting of work be prohibited:

During the term of the present agreement, the jurisdictional rights of the UMWA have repeatedly been infringed upon and undermined by the subcontracting of work. Because of serious problems which may result in any attempt to limit subcontracting, other than to impose an absolute ban on subcontracting, the UMWA proposes that subcontracting of unit work be absolutely prohibited. Furthermore, the Union reserves the right to resort to free collective bargaining when any employer attempts to evade the prohibition on subcontracting.

P.Ex. 8.

The UMWA also sought to expand work jurisdiction:

Section (f) is entirely inadequate to cover the existing jurisdiction of the UMWA. It does not deal with problems which have regularly recurred during the term of the 1971 agreement such as the trucking of coal from mine sites, the removal of overburden and reclamation of strip sites and the maintenance of mine roads. This section should be redrafted in its entirety to make it clear that all work related to or incident to the removal of coal from the earth, its processing, the hauling of coal from the mine site, the removal of coal waste and maintenance of gob piles, the restoration and reclamation of the mine site, the maintenance of mine roads, and all repair and maintenance work in and around the mine or at a central repair shop shall be performed solely by members of the UMWA employed by the mine owner or operator.

P.Ex. 8.

8. At the sixth session of the negotiations held on September 10, 1974, a UMWA bargaining representative stated the UMWA's goal was to terminate the subcontracting of coal haulers to independent haulers. (P.Ex. 9A, Collective Bargaining Notes, 6th Session, pp. 11–12).

9. At the request of the BCOA, negotiations resumed on October 14, 1974. On October 18, 1974, the UMWA, in response to the BCOA objections to a complete ban on subcontracting, offered the following proposal (P.Ex. 11):

Article II

SCOPE AND COVERAGE

Section (a) Work Jurisdiction: Classified Work

The following work is covered by the terms of this agreement and shall be performed, in accordance with the provisions of this Agreement, exclusively by members of the United Mine Workers of America: (1) all work which is related or incident to the removal of coal from the earth; the screening, crushing, washing or processing of coal; the hauling or transporting of coal from the mine site, preparation facility or loading facility; the removal of coal waste and overburden, maintenance of gob piles on waste embankments; the restoration and reclamation of mine sites; and the maintenance of all mine roads; (2) all repair and maintenance work in and around the mine or at a central repair shop where such work is normally performed.

Nothing in this Section shall be construed or applied to diminish the exclusive work jurisdiction otherwise expressed or implied by this Agreement.

· · · · ·

Section (g) Subcontracting of Classified Work

Except as expressly provided herein, the employer shall not, during the term of this Agreement, contract out any work within the exclusive jurisdiction of the United Mine Workers of America:

(1) An employer may continue existing arrangements with trucking companies or operators who presently provide trucking services provided that the labor costs of such trucking contractors, including both hourly rates and fringe benefit payments to their employees, are not less than those required by this Agreement.

(a) Repair work which is performed by a machine manufacturer under warranty or work which has heretofore been performed either on or off the mine site by other employers may be continued unless the employers signatory hereto have or can readily obtain without substantial expense the equipment necessary to perform such work and currently have available either regular employees or panel members who have the necessary skills to do the work.

10. From October 24 to November 8, 1974, the parties exchanged formal proposals on the issue of Scope and Coverage but made little headway in their negotiations. On November 9, 1974, the BCOA proposed a separate work jurisdiction clause which provided, in pertinent part:

Work Jurisdiction (a)

The production, preparation and trucking of coal, and work customarily related thereto is the work of the United Mine Workers and shall be performed by classified employees of the employer under this agreement, and may be contracted out only in the circumstances and under the conditions set forth in section (g) of this article.

· · · · ·

Section (g) Contracting and Subcontracting

(2) Trucking of Coal—The trucking of coal around the mine site, from the mine site to a preparation plant or loading facility may be contracted out to a contractor employing members of the UMWA under this agreement and where such contracting out is consistent with prior custom and practice.

(3) Repair and Maintenance Work—Repair and maintenance work customarily performed by classified employees at the mine or central shop shall not be contracted out except (a) where the work is being performed by a manufacturer or supplier under warranty, or (b) where the Employer does not have available equipment or regular employees with skills available to perform the work at the mine or central shop, provided, however, that the work shall be performed by UMWA members to the extent and in the manner permitted by law.

Guy Farmer, the Chief Negotiator and General Counsel for the BCOA testified that:

[W]e explained to the union, in presenting this proposal, that, if a contractor, in accordance with prior custom and practice, contracted out this work to a nonunion operator, that it would not be, in our opinion, a violation of the contract because if we contracted it out to a nonunion operator for business reasons, we felt that he had a legal right to do that, and therefore, it would not be a violation of the contract for him to do it, and that we intended to interpret and administer the contract that way.

Bear in mind, BCOA does not administer the contract. It is the individual coal operator's responsibility to administer the contract. We simply—BCOA simply negotiates the contract and gives interpretations of the contract, either on its own initiative or at the request of a coal operator member. (Tr. 715–716).

11. The UMWA rejected the BCOA proposal of November 9, 1974. In a Novem-

ber 10, 1974 memo, the UMWA noted that there were areas of disagreement in Article II, Sections (a) and (g), many of which were critical to reaching final agreement. The UMWA found Article II(g) as proposed to be unacceptable, because the BCOA proposal placed no limitations on subcontract practices.

12. On November 10, 1974, the UMWA indicated there was substantial disagreement in the area of subcontracting and submitted its counterproposal (P.Ex. 18), which provided, in pertinent part:

Section (g) Contracting and Subcontracting

(1) Trucking of Coal—The trucking of coal around the mine site, from the mine site to a preparation plant or loading facility may be contracted out to a contractor employing members of the UMWA under this agreement and where such contracting out is consistent with prior custom and practice of the Employer.

(2) Repair and Maintenance Work—Repair and maintenance work customarily performed by classified employees at the mine or central shop shall not be contracted out except (a) where the work is being performed by a manufacturer or supplier under warranty, or (b) where the employer does not have available equipment or regular employees with necessary skills available to perform the work at the mine or central shop, provided however, that the work shall be performed by UMWA members to the extent and in the manner permitted by law.

(3) The Employer may not contract out the rough grading in mine reclamation work.

In the negotiation session that followed the BCOA offer, the UMWA negotiators argued that the phrase "trucking of coal" contained in Section II(g)(1) of the BCOA proposal could be interpreted to exclude all other forms of transportation from the mine site to a preparation plant or loading facility. (See Notes, P.Ex. 9C, 41st Session, p. 14–23). The UMWA negotiators concluded that the proposed language did not contain an acceptable description of the union's work jurisdiction and, accordingly, rejected the BCOA proposal.

13. Throughout the entire course of negotiations between the parties, the issues of work jurisdiction and subleasing and subcontracting were considered to be intertwined.

14. With the expiration of the 1971 NBCWA on November 11, 1974, the UMWA strike began the following day in accordance with the Union's constitutional mandate of "No contract, no work." There was no agreement with respect to Article II(g) prior to November 11, 1974. On November 12, 1974, the BCOA presented a package proposal which covered all outstanding economic and noneconomic issues including the scope and coverage issues. The term, "trucking of coal", which had been included in Section II(a) of prior proposals was deleted, and the language, "Haulage of coal", and "removal of overburden", was substituted in its place. In Section II(g)(1), the term "haulage of coal", was substituted for the term "trucking of coal." (P.Ex. 20). On November 13, 1974, the parties agreed to substitute the term "transportation of coal" in lieu of "haulage of coal" in Article II, Sections (a) and (g) of the BCOA proposal of November 12, 1974. The parties reached an agreement on a tentative contract on or about 9:30 P.M., November 13, 1974.

15. The union negotiators then submitted the tentative contract for approval to the International Bargaining Council of the UMWA pursuant to Article XIX of the UMWA Constitution. The Council raised several objections to the terms of the tentative contract and directed the negotiators to renegotiate changes in five areas. No changes or modifications were requested in the Scope and Coverage provisions. On November 14, 1974, at one of the meetings of the International Council, Harry Patrick, Secretary-Treasurer of the UMWA stated:

I think that the first two Articles, Enabling Clause and Scope and Coverage, where there was a fight—and I mean a real dog fight—over each word, each

word that went in there, it meant something that we took away from the coal operators and the management of the mines.

Mike Trbovich, Vice President of the UMWA stated:

I think, you know, when you look at this contract and you look at the Enabling Clause and you look at the Scope and Coverage, I know that there's thousands of people in our Union, even some officers and I wasn't too educated on this— on these two articles, but these are the two most important articles in this contract.

These articles protect the United Mine Workers and I think that Chip just explained to you the Enabling Clause. And, after negotiating over there for days, and arguing with coal operators, I got an education on it and this is why I say that these are the most two important articles in this contract, to protect our jurisdiction and to protect our Union, as Chip has said.

Chip Yablonski, A UMWA negotiator and an attorney, stated:

It is very difficult to write limitations on subcontracting, as a matter of fact, without violating the hot cargo provisions of the National Labor Relations Act, to draft anything in this area without having jurisdiction clearly defined.

A major issue, and I think with all that went on here in the Executive Board over subcontracting out, and removal of overburden, I feel pretty good to say that that is clearly defined as work that is within our jurisdiction.

P.Ex. 26, 280–282.

16. On November 24, 1974, the BCOA and the UMWA agreed to various changes in the terms of the tentative contract, none of which are relevant in this case. Following the vote of approval of the revised tentative contract by the Bargaining Council, it was then submitted to the rank and file. A majority of the members of the UMWA ratified the agreement, and on December 6, 1974, the union terminated strik-

ing activities directed at those companies which had executed the 1974 NBCWA.

17. In the spring of 1974, a group of coal haulers who were signatory to the 1971 NBCWA, the Western Pennsylvania Coalhaulers Association, sought to negotiate with the UMWA for a separate coal hauling agreement. Although the parties engaged in sporadic discussions throughout the year, the UMWA refused to recognize the association as a multi-employer bargaining agent, and consequently, the discussion never culminated in any kind of an agreement. When the 1971 NBCWA expired on November 11, 1974, the employees of the coal hauler signatories ceased working under the UMWA constitutional mandate, "No contract, no work." The UMWA and the coal hauler signatories agreed to a thirty-day extension of the 1971 NBCWA, the thirty-day period commencing December 30, 1974.

18. Frank Kulish, the President of District No. 2, directed the local union officials within District No. 2, by letter dated January 7, 1975, to advise "all independent truck owner-operators who are not signatory to the 1974 Wage Agreement ... to come to the District No. 2 and sign a contract with the UMWA if they desire to continue working in and around UMWA mines." (P.Ex. 35). UMWA President Miller advised Kulish by letter dated May 29, 1974 (P.Ex. 55), to organize trucking companies in District No. 2 which:

1. Haul coal, overburden or mine refuse in or about the mine, including hauling to a screening, crushing, washing or other preparation facility or other mine related operation;

2. Haul raw coal from surface mine pit areas to ultimate consumers;

3. Haul coal on an essentially full-time basis.

19. On January 29, 1975, negotiations between the coal haulers and the Defendants having broken down, the Defendants authorized a strike against those coal haulers who had refused to sign the 1974 NBCWA. President Miller appointed John Lyons, Wilbur Geary, George O'Bush and

Robert Rorabaugh as temporary UMWA International Representatives to District No. 2. Miller authorized them to enlist coal haulers signatories to the 1971 NBCWA to sign the 1974 NBCWA. (P.Ex. 41, 42). Defendants attempted to organize coal haulers and urge them to sign the 1974 NBCWA regardless of whether or not they had been signatory to the prior agreements.

20. President Miller appointed a UMWA International Commission consisting of Frank Clements, John Kelly and J.B. Trout to direct the strike and negotiating efforts. Frank Kulish circulated a memorandum to all local union officers, committeemen and members of District No. 2 concerning the strike by Local 1600. In the memorandum, Kulish stated that the strike must be "limited to coal haulage companies and independent truckers who have not signed the agreement." (P.Ex. 46). Kulish further stated that the International Commission had authorized picketing at the "entrance to private property used by the unsigned truckers." (P.Ex. 46). Pursuant to these instructions, agents of the Defendants picketed the entrances to numerous mines worked by unsigned coal haulers.

21. On several occasions, from early December 1974, through April, 1975, Defendants coerced coal haulers into signing the 1974 NBCWA by means of picketing, enlisting the aid of coal mine companies to boycott non-signatories, and threatening to prohibit Plaintiffs from hauling any coal unless they signed the agreement. (T. 46, 63–65, 70, 112–113, 123–128, 136–138, 143–145, 172–174, 180–184, 186, 188, 415, 417–431, 440–445).

22. During the winter months of 1974–1975, the Defendants held various strike-related meetings in Ebensburg, Marion Center, Kittanning, New Alexandria, Clyde and Mundys Corner. At these meetings, representatives of the Defendants informed the coal haulers that they must either sign the 1974 NBCWA or cease hauling coal. (Tr. 66–71, 136, 139, 143–148, 180–184, 209–221, 251–255, 417–418, 440–445, 566–567).

23. Pursuant to their plans to encourage coal haulers to sign the 1974 NBCWA, the Defendants conducted a truck survey at numerous mines in Western Pennsylvania. The purpose of the survey was to determine whether coal haulers had signed the agreement. The unsigned truckers were told that they must sign the 1974 NBCWA. (Tr. 445–454).

Robert Rorabaugh, the Recording Secretary of Local No. 1600, served as a Special Representative of the UMWA from January 25, 1975 through March, 1975. In his capacity as Special Representative, Rorabaugh's sole responsibility was to urge coal haulers to sign the 1974 NBCWA.

24. The Defendants' attempts to force the coal haulers to sign the 1974 NBCWA continued through the spring of 1975. As a result of Defendants' efforts, 366 coal haulers became signatory to the 1974 NBCWA. Thirty-nine coal haulers were signatory to the 1971 NBCWA. (P.Ex. 61, 62).

## V. DISCUSSION

It is apparent that the matter of jurisdiction as set forth in Article II and Article II(g) of the 1974 Wage Agreement was an area of prime concern to the Defendant UMWA. Throughout the course of the negotiations between the parties, the themes of work jurisdiction and subcontracting were interwoven, and even prior to the start of the 1974 negotiations, it was recommended that Article II be amended to cover independent non-union truckers. Article II(g) as finally adopted was strongly bargained for in its initial proposal the UMWA sought to make it clear that all work related to, or incident to, the removal of coal, including the hauling of coal from the mine, should be performed solely by members of the UMWA. The history of the negotiations between the BCOA and the UMWA illustrates that the issues of subleasing and subcontracting and work jurisdiction were viewed synonymously, and there was clearly dissatisfaction with the manner in which jurisdiction had been previously defined in the 1971 agreement.

The UMWA wanted to limit subcontracting in the areas in which the UMWA felt that the UMWA should have primary jurisdiction; the work jurisdiction issue was a substantial factor in the decision to call and maintain the UMWA–BCOA strike, and was also related to the Defendant UMWA's efforts to ban subcontracting entirely, or alternatively, to obtain a clause which the Defendant UMWA could use to coerce the coal haulers into signing the same agreement. Article II was of major concern to the parties during the negotiations, and the failure of the UMWA to obtain what the UMWA considered to be satisfactory wording materially contributed to the decision to call and maintain the BCOA strike.

The Defendant argues that the BCOA strike was called as a result of other issues, that Article II(g) was a non-issue prior to the commencement of the strike, and that the language of Article II(g) as ultimately adopted had been agreed to prior to the commencement of the strike. However, the Court finds these contentions to be without merit, for it is obvious that the ratification procedure of the Union required a minimum of eight to ten days, during which time the "no contract, no work" policy was in effect. Thus, even if an agreement between the UMWA and the BCOA negotiators had been reached on November 13, 1974, the strike against the BCOA would have continued until November 23, 1974 at the earliest. In fact, there was no agreement reached prior to the expiration of the 1971 Wage Agreement and it was not until December 6, 1974, that the rank and file ratified the proposed contract, and no agreement was obtained until that date.

The Defendant also contends that Article II(g) was not a factor in the strike against the coal haulers. However, the thrust of Article II(g) was clearly targeted to the coal hauler, and the Union struck both the coal haulers and the BCOA in their efforts to obtain Article II(g) and to expand the UMWA's jurisdiction. The history of the negotiations between the parties establishes that there was substantial disagreement, even on the eve of the strike, as to the scope of Article II(g), and after the strike was called, the UMWA and the BCOA were still submitting proposals and counter-proposals regarding the issue of subcontracting. The scope of Article II(g) was still being negotiated even after the strike was called, and the UMWA obviously felt that the articles concerning work jurisdiction and subcontracting were the two most important articles in that contract. Article II(g) was a substantial factor in and materially contributed to the Union's decision to call and maintain the strike.

The Defendant does not dispute its liability for damages, if any, proximately caused by the enforcement of Article II(g) at the UMWA mines after December 6, 1974, but contends that there can be no damage award for the strike period of November 12 through December 6. In support of this contention, Defendant argues that Article II(g) could not have played a causal role in the continuation of the strike because the parties had already agreed to the clause on November 13. However, the Court of Appeals has previously considered the propriety of imposing liability for the period of the BCOA strike, and has concluded that such liability was proper

The Union's argument fails to take into account the district court's ultimate conclusion of law with regard to the secondary boycott issues. The district court held that the Labor Act was violated by the UMWA's "striking to force *coal mine companies* and coal haulers to sign the agreement. ..." 494 F.Supp. at 720 (emphasis added). Thus, it must have meant to impose liability under section 8(b)(4) for the period of the BCOA strike. We reach this conclusion even though the district court followed this holding with a citation to section 8(b)(4)(B), the enforcement provision, and not to section 8(b)(4)(A), the clause governing attempts to obtain hot cargo agreements. The district court apparently did not distinguish between the two provisions, and understood section 8(b)(4)(B) to cover "[a] strike to force an employer to sign an agreement which contains a hot cargo

clause in violation of section 8(e)." 494 F.Supp. at 710. Since the import of the decision by the district court is clearly that the Union's conduct both during and after the BCOA strike constituted unlawful secondary activity, we will not invalidate that determination merely because of a failure to cite all the relevant subsections of the Act.

711 F.2d at 536–37.

The Court of Appeals then remanded to this Court for a determination of the issue "whether the hot cargo clause materially contributed to the decisions to call or maintain the BCOA strike." 711 F.2d at 538. This Court, on remand, concludes that it did. The work jurisdiction issue, which encompasses the issue of subcontracting, was clearly a strike issue on November 12, 1974, when the strike commenced. The hot cargo clause materially contributed to the decision to call and maintain the BCOA strike, and even if there had been an "understanding" with respect to Article II(g) on November 13, 1974, there was still no contract settlement on that date because there was no way of knowing whether the membership of the UMWA would accept or reject the proposed language, and there was, in fact, no settlement by the UMWA with the BCOA until December 6, 1974, when the rank and file finally ratified the entire agreement.

## VI. CONCLUSIONS OF LAW

1. Jurisdiction of this Court is properly invoked under 29 U.S.C. § 187.

2. The provisions contained in Article II(g) of the 1974 NBCWA are illegal hot cargo clauses under 29 U.S.C. § 158(e).

3. Defendants' desire to obtain the illegal hot cargo provision contained in Article II(g) of the 1974 NBCWA was a substantial factor in and materially contributed to the Defendants' decision to call and maintain the strike against the BCOA from November 12, 1974, through December 6, 1974.

■ 4. By striking to force coal mine companies and coal haulers to sign the agreement containing the illegal hot cargo clause, Defendant violated the secondary boycott provisions of Section 8(b)(4) of the NLRA.).

5. The Union's conduct both during and after the BCOA strike constituted unlawful secondary boycott activity.

6. Defendants, by their action in calling and maintaining a strike from November 12, 1974 through December 6, 1974, that had continuing effects in Defendant's strike against the coal haulers, violated the secondary boycott provisions of the Section 8(b)(4) of the NLRA.

7. The effects of the Defendants' strike against the BCOA, which was called and maintained substantially to obtain the illegal hot cargo clause contained in Article II(g), went beyond December 6, 1974, the end of the strike, in that when the Defendant's strike against the BCOA terminated December 6, 1974, the Defendants continued their strike against the coal haulers in order to coerce the coal haulers to sign the 1974 NBCWA by use of the illegal hot cargo clause.

■ 8. Plaintiffs are entitled to recover damages under section 303, 29 U.S.C. § 187(b), for the period after the Defendants' strike against the BCOA during which time the Defendants continued their strike against the coal haulers in order to coerce the coal haulers to sign the 1974 NBCWA by use of the illegal hot cargo clause, in that Plaintiffs were injured by reason of a violation of section 8(b)(4) of the NLRA, as amended, 29 U.S.C. § 158(b)(4).

9. Plaintiffs are entitled to recover damages under section 303, 29 U.S.C. § 187(b), for the period of November 12, 1974 through December 6, 1974, in that the illegal hot cargo clause of Article II(g) was a substantial factor in and materially contributed to the Defendant's decision to call and maintain the strike against the BCOA, and Plaintiffs were injured by reason of a violation of section 8(b)(4) of the NLRA, as amended, 29 U.S.C. § 158(b)(4).