704 F.2d 690
 113 L.R.R.M. (BNA) 2117, 97 Lab.Cas. P 10,043
 C & K COAL COMPANY, Cambria Coal Company, Shannon Coal
Company, W.P. Stahlman Coal Company and Vantage Coal Company
and Fred L. Myers, Debra M. Campbell, Laura Mays, Sandra K.
Tower and Ralph E. Morrison, individually and on behalf of
all others similarly situated
v.
UNITED MINE WORKERS OF AMERICA, Arnold Miller, District No.
5 of United Mine Workers of America, Louis Antal, Pete Sabo,
Estel Taylor, John Chach, District No. 2 of United Mine
Workers of America, Val Scarton, Walter Harris, Local Union
No. 1269 of United Mine Workers of America, James J.
Tarranto, Richard Mulhollen, Local Union No. 4426 of United
Mine Workers of America, Paul D. Michel, Local Union No.
6132 of United Mine Workers of America, Local Union No. 1368
of United Mine Workers of America, Lindsay R. Cleaver,
Norman L. Connor, Amerigo De Pelligrin, Thomas Eshenbaugh,
Jeffrey Lynn Lash, Audley Montgomery, Robert J. Riggatire,
Charles E. Ponce, John W. Black, Robert J. Matter, Don
Valauri, Frank J. Nemeth, Joseph G. Miller, John Doe and
Richard Roe.
Appeal of C & K COAL COMPANY, et al., in No. 82-5274.
Appeal of DISTRICT NO. 5 OF UNITED MINE WORKERS OF AMERICA,
in No. 82-5275.
Appeal of DISTRICT NO. 2 OF UNITED MINE WORKERS OF AMERICA,
in No. 82-5276.
Appeal of LOCAL UNION NO. 1269 OF UNITED MINE WORKERS OF
AMERICA, in No. 82-5277.
Appeal of LOCAL UNION NO. 4426 OF UNITED MINE WORKERS OF
AMERICA, in No. 82-5278.
Appeal of LOCAL UNION NO. 6132 OF UNITED MINE WORKERS OF
AMERICA, in No. 82-5279.
Appeal of LOCAL UNION NO. 1368 OF UNITED MINE WORKERS OF
AMERICA, in No. 82-5280.
 Nos. 82-5274 to 83-5280.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 16, 1982.
Decided April 5, 1983.
 
 Charles B. Gibbons (argued), Alan A. Garfinkel, Michael J. Manzo (argued), Gary L. Goldberg (argued), Berkman Ruslander Pohl, Lieber & Engel, Pittsburgh, Pa., for C & K Coal Co., et al.
 Harrison Combs, Washington, D.C., Lloyd F. Engle, Jr., (argued), Lou Ann Phelps, Kuhn, Engle & Stein, Pittsburgh, Pa., for UWMA Intern.
 Louis B. Kushner, Robert A. Cohen (argued), Robert S. Whitehill, Rothman, Gordon, Foreman & Groudine, Pittsburgh, Pa., for Dist. No. 5 of the United Mine Workers of America.
 Bruce McKenrick, McKenrick & McKenrick, Edensburg, Pa., for Local Union No. 1269 of the United Mine Workers of America.
 David A. Lovejoy, Pittsburgh, Pa., for Local Union No. 4426 of the United Mine Workers of America.
 Blair V. Pawlowski (argued), Pawlowski & Tulowitzki, Ebensburg, Pa., for Dist. No. 2 of the United Mine Workers of America.
 Dino S. Persio, Smorto, Persio & Zadzilkozo Ebensburg, Pa., for Local Union No. 1368 of the United Mine Workers of America.
 Before GIBBONS, HIGGINBOTHAM and BECKER, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 These appeals arise out of a multi-count civil action in the United States District Court for the Western District of Pennsylvania by a group of affiliated non-union coal companies[1] and their employees seeking damages for interruption of their operations during the strike by the United Mine Workers of America from December 6, 1977 to March 27, 1978. The defendants are United Mine Workers of America (the International), District 2 and District 5 of that organization, and Locals 4426, 6132, 1265 and 1368. After a bench trial, judgment was entered in favor of the International on all counts, against District 2, District 5, and each of the Locals on one count, but in their favor on the remaining counts. The judgment awards damages to the Companies in the aggregate amount of $1,447,189, but nothing to their employees.[2] Districts 2 and 5 and the Locals appeal from that judgment. The Companies and the employees cross-appeal. Except as to one element of damages, we affirm.
 
 I.
 The Claims and Their Disposition
 
 2
 Between December 6, 1977 and March 27, 1978, the International and its affiliated Districts and Locals engaged in an economic strike against members of the Bituminous Coal Operators Association, with whom they have a collective bargaining relationship. During that strike those members ceased production. The Companies are not members of the Bituminous Coal Operators Association and their employees are not members of the United Mine Workers. Thus they attempted to continue production during the strike, until production was interrupted as a result of picketing activities of United Mine Workers members. On October 15, 1979 the plaintiffs' companies and five employees filed a complaint seeking individual relief, and class action relief on behalf of over 950 employees. The complaint contains ten counts, of which the first four are predicated upon federal law, and the remaining six on Pennsylvania law. The federal law counts include:
 
 
 3
 (1) claims for compensatory damages under section 303 of the Labor Management Relations Act, 29 U.S.C. Sec. 187 (1976), for violations of section 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act, 29 U.S.C. Sec. 158(b)(4)(i) and (ii)(B) (1976) (Counts I and II);
 
 
 4
 (2) claims for treble damages under section 4 of the Clayton Act, 15 U.S.C. Sec. 15 (1976 & Supp. IV 1980), for violation of section 1 of the Sherman Act, 15 U.S.C. Sec. 1 (1976) (Count III);
 
 
 5
 (3) claims for compensatory and punitive damages for engaging in a conspiracy in violation of 42 U.S.C. Sec. 1985(3) (Supp. IV 1980) (Count IV);
 
 The Pennsylvania law counts include:
 
 6
 (1) claims for compensatory and punitive damages for tortious interference with business relationships (Counts V and VIII);
 
 
 7
 (2) claims for compensatory and punitive damages for the tort of conspiracy (Counts VI and IX);
 
 
 8
 (3) claims for compensatory and punitive damages for the tort of trespass (Counts VII and X).
 
 
 9
 The count based upon 42 U.S.C. Sec. 1985(3) was dismissed in a pretrial ruling. Since that count was the only one in which relief was sought on behalf of employees its dismissal meant that no evidence was offered at trial on their behalf. All the other claims were tried in a 34 day non-jury trial, at the end of which, after making detailed findings of fact, the court held:
 
 
 10
 (1) that the International was not liable on any claim;
 
 
 11
 (2) that both Districts and all four Locals engaged in activities which violated sections 8(b)(4)(i) and (ii)(B), and were liable for damages caused by those activities;
 
 
 12
 (3) that no defendant violated section 1 of the Sherman Act; and
 
 
 13
 (4) that no defendant was liable under the Pennsylvania law prohibiting tortious interference with a business relationship, conspiracy or trespass.
 
 
 14
 Although the evidence offered in support of the pendent Pennsylvania law claims was essentially the same as that offered under section 303 of the Labor Management Relations Act, the court reached a different factual conclusion. While concluding that by a preponderance of the evidence the Companies established liability under section 303 against all defendants except the International, the court held that they failed to meet the more exacting clear proof standard applicable to those pendent state tort law claims by virtue of section 6 of the Norris-LaGuardia Act, 29 U.S.C. Sec. 106 (1976). See United Mine Workers v. Gibbs, 383 U.S. 715, 741, 86 S.Ct. 1130, 1146, 16 L.Ed.2d 218 (1966). The Sherman Act claim was dismissed because the Companies failed to prove by a preponderance of the evidence that there was an agreement to restrain trade to which any non-labor organization was a party, and alternatively because the Sherman Act is preempted by section 8(b)(4) of the National Labor Relations Act.
 
 
 15
 In calculating damages on section 303 counts the court allowed recovery of out-of-pocket expenses incurred by virtue of the defendants' activities, lost profit on lost production, and pre-judgment interest. The court refused to award as an element of damages lost profits on inventory available for shipment but not shipped because of the defendants' activities. Those defendants found liable were held to be jointly and severally liable to each company.
 
 
 16
 Each District and Local appeals from the section 303 judgment against it. The Companies appeal: (1) from the judgment in favor of the International on the section 303 count; (2) from the judgment in favor of all defendants on the Sherman Act count; and (3) from the judgment in their favor to the extent that it excluded certain elements of damage. The class representatives appeal from the dismissal of the section 1985(3) count.
 
 II.
 Defendants' Section 303 Contentions
 A. Liability
 
 17
 The parties are essentially in agreement with respect to the applicable legal standards for liability under section 303. They agree that the union defendants could not, without violating section 8(b)(4), picket non-union mines, harass the employees of such mines, destroy the mine equipment, or interfere with deliveries to the mine customers. They agree, as well, that labor organizations can be held liable for such activities if they are carried on by union agents. 29 U.S.C. Sec. 185(b) (1976). They agree, moreover, that in determining agency "the question whether specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. Sec. 185(e) (1976). The issue, as to the International, the Districts and the Locals, is whether under common law agency principles any could be held liable. A separate analysis must be made for each. Kerry Coal Co. v. United Mine Workers, 637 F.2d 957 (3d Cir.), cert denied, 454 U.S. 823, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981). Nor is there any dispute that the evidentiary standard in a section 303 case is preponderance of the evidence. See United Mine Workers v. Gibbs, 383 U.S. at 736, 86 S.Ct. at 1144. There is no real dispute that the evidence supports findings that at each location for which damages were awarded United Mine Workers members engaged in acts of violence and intimidation. With one exception,[3] the only real complaint of those defendants found to be liable is that the trial court applied the agency test set forth in Carbon Fuel Co. v. United Mine Workers, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979), and Kerry Coal Co. v. United Mine Workers, 637 F.2d 957, after making findings of fact which are clearly erroneous. Fed.R.Civ.P. 52(a). Some half-hearted efforts are made by several of those defendants to suggest that the court's conclusions as to the "ultimate" fact of agency are subject to plenary review. Consideration of those suggestions are foreclosed by the interpretation of Rule 52(a) in Pullman Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). Thus we turn to the task of determining whether the trial court's agency findings are clearly erroneous as to any union defendant held liable.
 
 
 18
 (1) The Competing Theories
 
 
 19
 The Companies' theory at trial was that all defendants wanted to bring about a total halt to the production of steam coal and metallurgical coal, non-union as well as union, in order to maximize economic disruption during the strike, thereby increasing pressure for a favorable settlement with the Bituminous Coal Operators Association. To that end, the unions undertook to pay on vouchers of United Mine Workers members for picket duty, and in anticipation of illegal secondary activity created legal defense funds which would pay attorneys' fees and fines for picketing members who were arrested. The defendants' theory was that the payments were to be made either for lawful organizational picketing or lawful organizational travel expense. Their position was that no District or Local authorized or ratified unlawful secondary activity. The purpose of the legal defense funds, according to these defendants, was entirely humanitarian. They knew that United Mine Workers members, traditionally, during a strike, tended to engage in acts of violence, and would need funds for attorneys' fees and fines. In any event, they contended, the legal defense funds were divorced from the union organizations, and could not be relied upon to prove agency.
 
 
 20
 (2) District 5
 
 
 21
 The trial court held that District 5 instigated, supported, ratified and encouraged illegal secondary activity. That holding is amply supported by the testimony and documentary evidence detailed in the court's findings of fact. 537 F.Supp. at 493-95. According to the court, the Executive Board of District 5, prior to the strike, met and approved the picketing of non-union coal operators, agreed to compensate District 5 members for such illegal picketing, and set up a voucher system to accomplish this purpose. After the strike, officers of District 5 paid from District funds vouchers of secondary picketers totaling $43,403. During the strike members of the District Executive Board directed unlawful secondary activity through bi-weekly meetings at the Elks Club in New Kensington, Pennsylvania. In December 1978, the President of the District, acting within the scope of his authority and with approval of the Executive Board, established a legal defense fund for the payment of fines, counsel fees and costs, as an encouragement for illegal activity. The voucher payments were made from District 5's general fund with knowledge that the pickets being paid had engaged in illegal secondary activity. Payments from the legal defense fund were made with the same knowledge. There is record support for all of these findings. Thus the liability determinations against District 5 are not clearly erroneous.
 
 
 22
 (3) District 2
 
 
 23
 The trial court held that District 2 also instigated, supported, ratified and encouraged illegal secondary activity. That holding, too, is amply supported by the testimony and documentary evidence detailed in the court's findings of fact. 537 F.Supp. at 495-97. In December 1977, the District 2 Executive Board, like that of District 5, set up a voucher plan for compensating pickets at non-union sites. The District President directed illegal secondary activity through regular meetings at Ebensburg Courthouse. Members of the Executive Board engaged in secondary picketing. The President of District 2 met with the President of C & K Coal and informed him that the picketing would continue if the company attempted to deliver coal to its customers. The Board approved the payment from the Strike Relief Fund of fines and costs imposed on members for illegal secondary activity. It secured and paid various attorneys to represent District members whom it knew had engaged in illegal secondary activity including violence. As in the case of District 5, there is record support for all of these findings. The liability determination against District 2 is not clearly erroneous.
 
 
 24
 (4) Local 1269
 
 
 25
 The trial court held that Local 1269 directed, authorized and ratified illegal secondary conduct. That holding is also amply supported by the testimony and documentary evidence in the court's findings of fact. 537 F.Supp. at 497-98. President Tarranto and Vice-President Richard Mulhollen personally directed mass picketing at the Fallen Timber Tipple and at a public roadway providing access to it. The Local admitted in an answer to interrogatory that it authorized picketing of plaintiffs' facilities. The officers of the Local collected vouchers from pickets engaging in illegal secondary activity, presented these for payment by District 2, and supported payments by the District of fines, court costs and counsel fees of members who had engaged in illegal activities.
 
 
 26
 Local 1269 contends that while there may be evidence that it directed, authorized and ratified illegal secondary activity in the Cambria area there is no evidence that it directed, authorized, or ratified such activity in the Clarion area. Thus, it contends, the court erred in holding it jointly liable to C & K Coal. There is evidence that President Tarranto was assigned by District 2 to picket C & K, that he circulated information to members about C & K picketing assignments to Local members. Over two hundred Local 1269 member gasoline vouchers were submitted to and paid by District 2. Tarranto testified that members were spread out over several counties. In order to hold that Local 1269 and District 2 are not jointly and severally liable, we would be required to disregard substantial evidence that the Districts and Local 1269 were cooperating in an ongoing course of conduct directed at all of the Gulf Resources coal operations. As the court notes, "[t]heir acts were coordinated, similar, consistent and indistinguishable." 537 F.Supp. at 510. Given the common ownership of these operations and the common object of the Districts and the Locals to prevent the delivery of non-union coal, the court's conclusion that the Districts and Locals were joint tortfeasors cannot be set aside as clearly erroneous.
 
 
 27
 (5) Locals 4426, 6132 and 1368
 
 
 28
 The trial court held that Locals 4426, 6132 and 1368 directed, authorized and ratified illegal secondary conduct. 537 F.Supp. at 498-99. The evidence referred to in the court's findings of fact supports those findings, and they are legally sufficient to impose liability on the three Locals. Officers of each coordinated illegal picketing activity and processed vouchers for members engaging in such activity. Each took official action to encourage members to engage in that activity. As to their joint liability, we refer to our observations about Local 1269. The trial court's section 303 liability determination against them is not clearly erroneous.
 
 B. Damages
 
 29
 (1) Apportionment
 
 
 30
 Each defendant contends that the court erred in failing to apportion the damages awarded to each plaintiff among the several defendants in accordance with their respective responsibilities. We reject that contention. The court found:
 
 
 31
 Their acts were coordinated, similar, consistent and indistinguishable. To attempt to apportion damages would be impossible because the conduct of one organization did not exceed the conduct of the others. The acts were authorized and jointly performed on a mass basis at the direction of all defendants.
 
 
 32
 537 F.Supp. at 510. This finding is not clearly erroneous. What defendants propose is a rule of law that if several labor organizations so coordinate their joint illegal secondary activities as to make it impossible to pinpoint the damage caused by any one of them, none can be held liable in damages under section 303. We have been referred to nothing suggesting that Congress intended so absurd a rule. The defendants point to cases such as Eazor Express, Inc. v. International Brotherhood of Teamsters, 520 F.2d 951 (3d Cir.1975), as authority for an apportionment rule. Those cases, however, involve apportionment of damages caused by illegal conduct from that caused by legal conduct. Violations of section 8(b)(4) are torts, and joint tortfeasors cannot escape liability because of the impossibility of apportioning the damage caused by the illegal conduct of each.
 
 
 33
 (2) Attorneys' Fees
 
 
 34
 Although they did not raise the question in the trial court, the defendants, in a supplemental brief to this court, contend that the court erred in including in that part of the damage award based on out-of-pocket expenses attorneys' fees incurred by the Companies in obtaining state court injunctions against defendants' illegal activities. In Kerry Coal Co. v. United Mine Workers, 637 F.2d 957, 966 (3d Cir.), cert. denied, 454 U.S. 823, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981), this court affirmed a judgment which included such expenses as an element of damages. The judgment in that case was predicated on a verdict finding both a section 8(b)(4) violation and a Pennsylvania law tortious interference with a business relationship. This judgment is based only on section 8(b)(4) and section 303. After it was entered the Supreme Court in Summit Valley Industries v. Local 12, --- U.S. ----, 102 S.Ct. 2112, 72 L.Ed.2d 511 (1982), held that attorneys' fees incurred in filing unfair labor charges with the National Labor Relations Board were not recoverable elements of damage in an action under section 303. The court held that the American rule, barring recovery of attorneys' fees, applies in such proceedings.
 
 
 35
 The Companies contend that we should reject the Summit Valley contention since the matter was not raised in the trial court. See, e.g., Franki Foundation Co. v. Alger-Rau & Associates, Inc., 513 F.2d 581, 586 (3d Cir.1975). In this instance, however, we think that more appropriate rule is that of The Schooner Peggy, 1 Cranch 103, 2 L.Ed. 49 (1801), that appellate courts are obliged to apply the law as they find it at the time of their judgment. If the application of the rule of law required additional findings of fact, a remand to the trial court might be appropriate. E.g., Moore v. Tangipahoa Parish School, 496 F.2d 696, 697 (5th Cir.1974); Wright v. State of Florida, 495 F.2d 1086, 1090 (5th Cir.1974). But where, as here, the application of the rule is clear as a matter of law, the issue should be decided by us. We hold, therefore, that so much of the judgment as is based upon payment of attorneys' fees in prior litigation between the same parties must be vacated. We will remand to the trial court for determination of the amount.
 
 III.
 Plaintiffs' Liability Contentions
 
 36
 A. The Section 303 Case Against the International
 
 
 37
 The trial court, applying a preponderance evidentiary standard, and the Carbon Fuels legal tests for agency, held that the International could not be held liable for unlawful secondary activity. In so finding the court made credibility judgments, and drew inferences from conflicting evidence. The court found that the International did not:
 
 
 38
 (A) Authorize or direct picketing of plaintiffs' facilities prior to or during the strike; or
 
 
 39
 (B) Authorize or direct violence or mass picketing at plaintiffs' facilities; or
 
 
 40
 (C) Participate in any act of violence, mass picketing, coercion or threats of secondary employers or employees; or
 
 
 41
 (D) Encourage, instigate, support, promote or ratify illegal acts by its employees, members or subordinate labor organizations; or
 
 
 42
 (E) Encourage or induce secondary employers, or employees, to cease work, strike or refuse to handle plaintiffs' product; and
 
 
 43
 (F) The International did not: Pay or provide counsel for pickets, or pay fines, bonds or court costs for miners charged with violation of state criminal laws; or pay money for illegal purposes; or pay money to strikers for any illegal purpose;
 
 
 44
 (G) The Constitution of the UMW establishes various autonomous labor organizations; and there is no evidence that the International transgressed any provision of its constitution, or that it was empowered by that document to discipline any labor organization, or member thereof, under the circumstances. There was no official sanction of the unauthorized acts of the membership and the provisions relied upon by plaintiffs simply do not accord the International the power and duty to act;
 
 
 45
 * * *
 
 
 46
 537 F.Supp. at 492. There is evidence from which different inferences could be drawn. Indeed the jury which heard very similar evidence about some of the same actors in the case which we reviewed in Kerry Coal Co. v. United Mine Workers, 637 F.2d 957 (3d Cir.), cert. denied, 454 U.S. 823, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981), drew different inferences, returning a verdict against the International for which we found sufficient evidentiary support. Our scope of review under Rule 52(a), however, does not permit us to make different credibility judgments or to draw different inferences from conflicting evidence than those drawn by the trial court. The Companies contend that the trial court's findings of fact are on this record clearly erroneous. We disagree.
 
 B. The Pennsylvania Tort Claims
 
 47
 Rule 52(a) also requires that we affirm the trial court's dismissal of the pendent state law claims. The trial court, applying the clear proof evidentiary burden of section 6 of the Norris-LaGuardia Act, concluded that while the evidence of the section 8(b)(4) violations was established by a preponderance of the evidence, the burden applicable under section 303 of the Labor Management Relations Act, it did not satisfy the higher burden required to prove the state tort law claims against a labor organization. 537 F.Supp. at 504-06. Making that distinction served, of course, to protect the Districts and Locals from an award of punitive damages. But as the Supreme Court points out in United Mine Workers v. Gibbs, the distinction in evidentiary burdens "is not surprising, for on state claims, though not on Sec. 303 claims, punitive damages may be recovered." 383 U.S. at 736, 86 S.Ct. at 1144. The task of applying different evidentiary burdens to the same evidence may have required considerable mental agility. There is no indication, however, that the task was not performed in entire good faith. We cannot go behind the trial court's negative assessment of the plaintiffs' case under the Norris-LaGuardia Act evidentiary standard.
 
 C. The Sherman Act Case
 
 48
 The Companies, relying on Connell Construction Co., Inc. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), constructed a somewhat ingenious theory of antitrust liability. The theory is that when in the face of violent and coercive secondary activity by the Districts and the Locals it ceased delivery of coal, it thereby entered into a combination with those organizations, which restrained trade in violation of 15 U.S.C. Sec. 1. The trial court rejected this theory on three grounds. The court found, first, that no coal producer in fact agreed to stop shipments. Indeed each company continued to make shipments whenever conditions permitted them. 537 F.Supp. 500-01. Alternatively, the court concluded that in any event the Sherman Act was, in the labor context, totally preempted by section 8(b)(4). 537 F.Supp. 503. Finally, the court held that if the Sherman Act was applicable, the plaintiffs had failed to prove the claim by the clear proof standard of section 6 of the Norris-LaGuardia Act.
 
 
 49
 The trial court's finding that there was no agreement whether under a preponderance or a clear proof standard, is not clearly erroneous. Indeed the theory espoused by the Companies suggests that the victim who hands over his wallet to an armed robber thereby becomes a coconspirator in the robbery. Absent agreement, there is no concert of action with a non-labor party, and thus no possibility of antitrust liability. We will, therefore, affirm the dismissal of the Sherman Act count.
 
 
 50
 In affirming, we do not rely upon the alternative legal ground relied on by the trial court. While there is no reason to decide the issue, we note our reservations about the soundness of the position that section 8(b)(4) preempts the Sherman Act when there is an agreement between a labor organization and a non-labor party. See Consolidated Express, Inc. v. New York Shipping, 602 F.2d 494 (3d Cir.1979).
 
 D. The Section 1985 Count
 
 51
 The Companies and the class representative employees contend that the court erred in its pre-trial dismissal of Count IV, which charges the defendants with a violation of 42 U.S.C. Sec. 1985(3). They rely on the interpretation of that statute in Scott v. Moore, 680 F.2d 979 (5th Cir.1982) (en banc), cert. granted, --- U.S. ----, 103 S.Ct. 442, 74 L.Ed.2d 599 (1982). In Scott v. Moore, a divided court held that a conspiracy directed against a class comprising non-union employees fell within the prohibitions of the Ku Klux Klan Act. The defendants urge that this court has tacitly rejected the position of the Fifth Circuit majority by restricting application of section 1985(3) to conspiracies directed against classes identified by some immutable characteristic such as race, sex or national origin. See generally Carchman v. Korman Corp., 594 F.2d 354 (3d Cir.), cert. denied, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979). Novotny v. Great American Federal Savings & Loan Ass'n, 584 F.2d 1235 (3d Cir.1978) (en banc), rev'd on other grounds, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); Jennings v. Shuman, 567 F.2d 1213 (3d Cir.1977); Brawer v. Horowitz, 535 F.2d 830 (3d Cir.1976). Some of our cases have spoken about immutable characteristics, but in context those references were merely indications of class characteristics which should be treated analogously with race. The question whether the statute protects against conspiracies, not involving state action, aimed at political classes, as well as classes whose members have the requisite immutable characteristics, is an open one in this court.
 
 
 52
 As the majority opinion in Scott v. Moore discloses, there is significant legislative history suggesting that the Ku Klux Klan Act was intended to reach private conspiracies directed against Republicans. The Scott v. Moore majority concluded that non-union workers were in that case the alleged targets of a political conspiracy.
 
 
 53
 We are not persuaded that Count IV alleges a claim falling within 42 U.S.C. Sec. 1985(3) even if we assume its applicability to private conspiracies motivated by hostility to the political views of the targets. It is true that the complaint alleges a conspiracy directed against non-union coal mines and miners. The charge is not, however, that the conspiracy is directed against non-union coal miners because of their political views on union membership or any other subject. Fairly read, the complaint alleges a conspiracy to prevent the sale of non-union coal so as to advance the economic interests of the defendant unions in their bargaining with the Bituminous Coal Operators Association. Since its revival in Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Ku Klux Klan Act has never been held to apply to private, economically motivated conspiracies. That, in essence, is what is charged in this instance. This being so, we need not attempt to resolve the interesting issues which divided the Court of Appeals for the Fifth Circuit and has now attracted the attention of the Supreme Court. We will affirm the dismissal of Count IV.
 
 IV.
 Plaintiffs' Damage Contention
 
 54
 The Companies contend that the trial court's damage award was inadequate to the extent that it failed to include lost profits on inventory on hand available for shipment. In December of 1977 they had on hand a 154,000 ton inventory of processed coal, 129,254 tons of which they were unable to ship because of violence, threats and intimidation by the defendants. The trial court refused to award damages because the 129,254 tons were later sold at a higher price. 537 F.Supp. at 508. This, the Companies urge, was error, because coal is fungible, not earmarked goods, and profits made by the injured party after breach should not be deducted from otherwise recoverable damages.
 
 
 55
 If this were an action for breach of contract there might be considerable merit to this contention. Restatement (Second) of Contracts Sec. 347 comment f (1981). The Companies rely on Hughes v. Chesapeake & Ohio Coal & Coke Co., 269 F. 589 (3d Cir.1921), as authority for the proposition that the same rule applies when a third party interferes with the performance of a contract for the sale of fungible goods. They urge that such a rule is particularly well-suited for application in a section 303 case, since Congress in enacting section 8(b)(4) intended that parties not involved in a primary labor dispute should be free to take advantage of the free market.
 
 
 56
 There is considerable merit in the Companies' position that if they had unlimited capacity for the production of fungible goods they should in a section 303 case be able to recover lost profits on all they can prove they might have sold. Without deciding that legal question, however, we note that the application of such a rule is foreclosed here by the trial court's findings. The trial court found that "[h]ere plaintiffs sold the tonnage to other customers and as evidence of their limited production capacity they declined a specific offer from American Electric Power Company to purchase all the coal in the inventory on or about December 31, 1977." 537 F.Supp. at 508. The finding that they lacked unlimited capacity to produce fungible goods is not clearly erroneous. Thus assuming that the fungible goods rule properly applies in a section 303 case, in this instance the plaintiffs have failed to convince the fact-finder of an essential element for its application.[4]
 
 V.
 
 57
 Except as noted in Part II B(2) above with respect to attorneys' fees, the judgment appealed from will be affirmed in all respects. The case will be remanded to the district court for calculation of the proper amount of the judgment after deducting the attorneys' fees portion.
 
 
 
 [1]
 The companies, all headquartered in Clarion, Pa., are C & K Coal Company, Cambria Coal Company, Shannon Coal Company, Stahlman Coal Company and Vantage Coal Company. They are subsidiaries of Gulf Resources and Chemical Corporation, and form that parent company's coal mining division. Except when the context otherwise requires, they are referred to collectively in this opinion as the Companies
 
 
 [2]
 The district court's findings of fact and conclusions of law are reported. 537 F.Supp. 480 (W.D.Pa.1982)
 
 
 [3]
 The defendants urge that the court erred in including as an item of damages attorneys' fees incurred in state court proceedings seeking injunctive relief against violence. See infra
 
 
 [4]
 Judge Becker notes that there is evidence from which it might be found that the plaintiffs had virtually unlimited reserves of coal, and ample equipment and labor, and had the capacity to make unlimited sales. Thus, he notes, the trial court's conclusion that they had limited capacity conceivably is clearly erroneous. He finds it unnecessary to decide that question, however, because of the court's alternative holding that C & K failed to mitigate damages when it refused an offer from American Electric Power Company to purchase its inventory
 Plaintiffs contended at trial and contend here that it would not be reasonable to require them to mitigate their losses on December contracts by selling off reserves to American Electric Power or some other customer in the face of possible renewed violence if they would thereby lose the ability to meet the requirements of contracts for delivery in January and later. The district court heard considerable testimony concerning the ongoing effects of defendant's picketing on plaintiffs' ability to move its coal to market, but evidently believed that they would not have been disabled, as they claimed, and that they thus failed to mitigate damages. Judge Becker concludes that we cannot say on the basis of the record that has come to us that the court was clearly erroneous in that finding, which required the weighing of considerable testimony and the making of credibility judgments.
 While the other panel members do not meet the mitigation issue, our failure to do so should not be construed as rejecting Judge Becker's position on mitigation.