903 F.2d 961
 134 L.R.R.M. (BNA) 2352, 115 Lab.Cas. P 10,078
 Charles FEATHER t/a Feather Trucking, R.D. # 4, Box 653,
Altoona, Pennsylvania 16601; Thomas V. Patterson, R.D. # 2,
Box 66A, Clymer, Pennsylvania 15728; Lawton Trucking, Inc.,
R.D. # 1, Box 37, Shelocta, Pennsylvania 15774; D.P.
Zimmerman, Jr., 115 East Logan Avenue, Altoona,
Pennsylvania; Michael D. Rose, R.D. # 1, Homer City,
Pennsylvania 15748; David B. Smogyi, R.D. # 1, Box 253,
Nanty Glo, Pennsylvania; Donald Benyack, 115 William Penn
Avenue, Conemaugh, Pennsylvania 15909; Ruth A. Cordes,
Admx. Est. Edward W. Cordes, Jr., 215 15th Avenue, Juniata,
Altoona, Pennsylvania 16601; Everett C. Teeter, Jr. t/a
Everett C. Teeter Trucking, R.D. # 1, Box 188, Nanty Glo,
Pennsylvania 15943; William Nileski, R.D., Gallitzen,
Pennsylvania 16641; and Robert C. Ermin, 5500 Third Avenue,
Altoona, Pennsylvania 16602
v.
UNITED MINE WORKERS OF AMERICA and District 2, United Mine
Workers of America and Local 1600, United Mine
Workers of America, Appellants.
 No. 89-3649.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 8, 1990.
Decided May 21, 1990.
 
 Melvin P. Stein, (argued), Kuhn, Engle & Stein, Pittsburgh, Pa., Kurt C. Kobelt, Previant, Goldberg, Uelmen, Gratz, Miller & Brueggman, Milwaukee, Wis., Robert H. Stropp, Jr., United Mine Workers of America Intern. Union, Washington, D.C., for appellants.
 Jerald R. Cureton, (argued), Nina A. Riasanovsky, Robert G. Haas, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., Paul R. Hirschfield, Hirschfield & Hirschfield, Pittsburgh, Pa., for appellees.
 Before GREENBERG, SCIRICA and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 SCIRICA, Circuit Judge.
 
 
 1
 We first visited this matter seven years ago when certain coal haulers sought damages for interruption of their operations during a strike by the United Mine Workers of America (UMWA). In Feather v. United Mine Workers of America, 711 F.2d 530 (3d Cir.1983), we affirmed the UMWA's liability on the "hot cargo" clause but remanded for findings on causation and agency. We are now called upon to review the district court's findings on these two issues. We will affirm in part, reverse in part and remand for proceedings consistent with this opinion.
 
 I.
 
 2
 Although the facts have been extensively discussed in previous opinions,[1] we will repeat some of them here. During the Fall of 1974, the UMWA renegotiated its collective bargaining agreement with the Bituminous Coal Operators Association (BCOA), a multi-employer bargaining association of coal producers. At the same time, the Western Pennsylvania Coal Haulers Association (WPCHA), a group of coal haulers that had signed onto the previous contract between the UMWA and the BCOA, sought to negotiate a separate agreement with the UMWA. On November 11, 1974, the old agreement expired before a new agreement was consummated. The following day, the UMWA struck both the BCOA and the WPCHA. On December 6, the union approved a new contract with the BCOA, which included a provision--subsection (g) of Article II--that prohibited coal haulers who did not sign the agreement from transporting coal from BCOA mines.[2] The strike continued against WPCHA haulers until they signed the new agreement in the Spring of 1975.[3]
 
 
 3
 This suit, later certified as a class action, was brought in 1976 by eleven Western Pennsylvania coal haulers[4] against the International UMWA, District 2 and Local 1600. The haulers sought damages for losses suffered as the result of the UMWA's strike, which they alleged was illegal because an object of the strike was to force them to agree to a "hot cargo" clause[5] and to prevent BCOA members from using non-signatory haulers to transport coal.
 
 
 4
 Section 303(a) of the Labor Management Relations Act (LMRA) prohibits a union in an industry that affects commerce from engaging in "any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title." 29 U.S.C. Sec. 187(a) (1982). In turn, Sec. 8(b)(4)(B) of the National Labor Relations Act (NLRA) deems striking to "forc[e] or requir[e] any person ... to cease doing business with any other person" an unfair labor practice. 29 U.S.C. Sec. 158(b)(4)(B) (1982). The district court found that the UMWA violated these sections by striking to enforce the hot cargo clause and that it was liable for damages sustained after December 6, 1974, the date of the new contract with the BCOA. Feather, 494 F.Supp. at 710-11.
 
 
 5
 On appeal, we made clear that by striking to obtain the hot cargo clause the UMWA may also be liable for damages sustained during the BCOA strike from November 12 through December 6. Feather, 711 F.2d at 536-37. We relied on Sec. 8(b)(4)(A) of the NLRA, which provides that striking to force or require an employer "to enter into any agreement which is prohibited by subsection (e) of this section" constitutes an unfair labor practice. 29 U.S.C. Sec. 158(b)(4)(A) (1982). Under Sec. 8(e), entering a collective bargaining agreement wherein the employer "agrees to ... cease doing business with any other person" is an unfair labor practice. 29 U.S.C. Sec. 158(e) (1982).
 
 
 6
 Although we affirmed on the UMWA's liability, we remanded on two issues. Because the district court opinion "contain[ed] no determination of the proximate cause issue presented by the section 303(b) damage claim," we remanded on causation of damages. Feather, 711 F.2d at 538. We also remanded to resolve the agency question--the union's responsibility for the actions of individual members affecting independent hauler H & H. Id. at 539.
 
 
 7
 We have jurisdiction under 28 U.S.C. Sec. 1291 (1982). The district court directed entry of final judgment in favor of two class claimants after an express determination that there was no just reason for delay under Fed.R.Civ.P. 54(b).[6] We review the factual findings on causation and agency under the clearly erroneous standard. We have plenary review whether the law of the case forecloses consideration of subsidiary questions.
 
 II.
 
 8
 In remanding the issue of causation, we gave the following mandate:
 
 
 9
 To receive a damage award under [section 303(b) ], the plaintiffs in this case must demonstrate not that the unlawful hot cargo cause [sic] was an object of the BCOA strike, but that it was a substantial factor in or materially contributed to the Union's decision to call and maintain that strike.
 
 
 10
 Feather, 711 F.2d at 538 (emphasis in original). On remand, the district court concluded that the UMWA's desire to obtain the illegal hot cargo clause was "a substantial factor in and materially contributed to [its] decision to call and maintain the strike against the BCOA from November 12, 1974, through December 6, 1974." Feathers, 621 F.Supp. at 940. The UMWA challenges the district court's conclusion, questioning its compliance with the mandate and the validity of its findings.
 
 A.
 
 11
 The UMWA asserts that the district court failed to carry out our mandate by ignoring the causal impact of the hot cargo clause. The argument rests on the following language from the district court opinion:
 
 
 12
 The two issues of work jurisdiction and subcontracting were treated as similar objectives by the UMWA throughout the negotiations....
 
 
 13
 Feathers, 621 F.Supp. at 930; see id. at 936. According to the UMWA, "The District Court does not hold that the specific illegal language requiring contractors to employ 'members of the UMWA under the [1974 contract]' was a substantial cause of the strike. Instead, it holds that the broad issues of jurisdiction and subcontracting in general were such a substantial factor, thus avoiding the specific question remanded by this Court." We believe the district court properly carried out this part of the mandate.
 
 
 14
 The district court found that work jurisdiction incorporated haulage subcontracting. Preparing for the negotiations, UMWA officials identified elimination of haulage subcontracting as a top priority.[7] When bargaining commenced, the UMWA proposed a complete ban on subcontracting, and specifically that of coal hauling.[8] Significantly, the UMWA later indicated a willingness to negotiate from this position, foreshadowing its assent to the hot cargo clause.[9] After agreement was reached on the tentative contract, UMWA officials praised the inclusion of haulage subcontracting within UMWA work jurisdiction.[10] Therefore, we believe the district court considered the causal effect of the hot cargo clause in its findings.
 
 B.
 
 15
 Having concluded the district court addressed the mandate, we must now consider whether it did so correctly. Section 303(b) of the LMRA affords a federal cause of action for damages to "[w]hoever shall be injured in his business or property by reason or [sic] any violation of subsection (a) of this section." 29 U.S.C. Sec. 187(b) (1982). As the "by reason of" language makes clear, the section requires a "causal nexus" between the unfair labor practice and the haulers' injury. Feather, 711 F.2d at 537 (citations omitted). "The mere fact that the agreement the Union sought to obtain by striking contained a hot cargo clause is not enough." Id. at 538; cf. Mead v. Retail Clerks Int'l Ass'n, 523 F.2d 1371, 1379 n. 9 (9th Cir.1975). "[S]ection 303 permits recovery only if the unlawful conduct itself 'materially contributed' to or was a 'substantial factor' in bringing about the injury." Feather, 711 F.2d at 538 (quoting Mead, 523 F.2d at 1376). Stated conversely, when " '[the lawful] objectives, standing alone, would have caused the strike, but the unlawful objective, standing alone, would not,' " the materiality test is not met. Id. at 538 n. 8 (quoting Mead, 523 F.2d at 1379).
 
 1.
 
 16
 The UMWA maintains that the district court erred in finding the hot cargo clause to be a substantial cause for calling the strike. First, the UMWA argues that the significant (illegal) aspects of the clause had been agreed to before the strike was called, and thus could not have caused the strike. Second, assuming significant disagreement over the clause remained when the strike began, the UMWA argues that it was insufficiently important to materially contribute to calling the strike. We disagree.
 
 
 17
 For the purpose of causation, the district court's finding that the hot cargo clause remained on the table when the strike began, Feathers, 621 F.Supp. at 939, was not clearly erroneous. During the initial bargaining sessions in September, the UMWA sought a complete ban on coal hauling by independent haulers. Id. at 934. On October 18, responding to BCOA objections, the UMWA proposed to permit existing coal haulage subcontracting to continue subject to a union standards provision. Id. at 934-35. On November 9, the BCOA agreed to the inclusion of a work jurisdiction clause but rejected the elimination of subcontracting, proposing that "[t]he trucking of coal ... may be contracted out to a contractor employing members of the UMWA under this agreement." Id. at 935. On November 10, although apparently pleased by the hot cargo language, the UMWA rejected the BCOA proposal because it "placed no limitations on subcontracting practices" and again proposed a union standards provision. Id. at 931-32. On November 11, the UMWA rejected a BCOA proposal, which repeated the proposed hot cargo language but omitted the union standards clause, because "trucking of coal ... could be interpreted to exclude other forms of transportation." Id. at 936. On November 12, having failed to reach a contract, the UMWA went on strike pursuant to its constitutional mandate of "No Contract, No Work."[11] Id. Therefore, although the UMWA and BCOA had agreed to the illegal language before the strike--limiting subcontracting to haulers "employing members of the UMWA"--the hot cargo clause itself was an open issue when the strike began. In assessing the causal nexus of hot cargo language, we must consider the clause as a whole because illegal demands can become entwined with legitimate demands during negotiation of a provision. Cf. Frito-Lay, Inc. v. Local 137, Int'l Bhd. of Teamsters, 623 F.2d 1354, 1363 (9th Cir.) (Because unlawful objects often become enmeshed with legal objects in course of negotiations, strike must be viewed in context of bargaining that surrounds it), cert. denied, 449 U.S. 1013 & 1112, 101 S.Ct. 571 & 922, 66 L.Ed.2d 472 & 841 (1980).
 
 
 18
 Having concluded that the hot cargo clause--for the purpose of causation--was unresolved when the strike began, we now consider whether it was a substantial cause for calling the strike. We believe the evidence previously noted sufficiently establishes a causal nexus between the hot cargo clause and calling of the strike.
 
 
 19
 Nonetheless, the UMWA offers two primary arguments negating the clause's causal effect. First, the UMWA cites the existence of forty other unresolved issues on the eve of the strike, including high priority items like safety, economics, pensions and grievance arbitration, to demonstrate the causal immateriality of the hot cargo clause. This argument is not convincing. Section 303(b) does not require that the illegal object be the sole cause of the strike, only that it be a "substantial factor in or materially contribute[ ] to the Union's decision" to strike notwithstanding other factors also contribute. Feather, 711 F.2d at 538 (emphasis in original); see Frito-Lay, 623 F.2d at 1363 ("The controlling rules [of Sec. 303 causation] derive from tort law principles where more than one factor can be a substantial cause, and no single factor need be the sole causative element.") As we just concluded, the hot cargo clause materially contributed to calling of the strike.
 
 
 20
 Second, the UMWA argues that defining the scope of jurisdiction and demanding an end to subcontracting were legal objectives, and therefore the resulting illegal clause must be viewed in isolation. Born so late in the process, the argument goes, the hot cargo clause could only have been an immaterial cause of the strike. We do not believe that negotiations to obtain legal objectives can immunize the resulting illegal objective. We find the following language from Frito-Lay, offered in a different context, instructive:
 
 
 21
 There is a certain cadence to collective bargaining negotiations, both before a strike is called and while it continues. In the usual case, a strike occurs after a period of bargaining and after other, less coercive means of persuasion have failed. By then, an illegal demand may have become closely entwined with legitimate ones. A strike cannot, therefore, be viewed in isolation from the bargaining that surrounds it.
 
 
 22
 623 F.2d at 1363. Thus, when the UMWA relinquished its assertedly legitimate demands for an absolute ban of subcontracting or subcontracting pursuant to union standards and sought instead the hot cargo clause, the clause became a substantial cause of the BCOA strike.
 
 2.
 
 23
 The UMWA also maintains that the district court erred in finding the hot cargo clause to be a substantial cause for maintaining the strike past November 13. See Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (Under Fed.R.Civ.P. 52(a), " '[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' ") (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). We agree.
 
 
 24
 The evidence does not support the district court's finding that the hot cargo clause was a substantial factor in maintaining the strike after November 13. After the strike had commenced, the BCOA and UMWA continued to negotiate over the scope of the illegal hot cargo clause, substituting "haulage" for "trucking." Feathers, 621 F.Supp. at 936. On November 13, the parties agreed to substitute "transportation" for "haulage" in the hot cargo clause, and reached a tentative contract that evening. Id. The tentative contract was then submitted to the UMWA's International Bargaining Council under Article XIX of the union's constitution. Id. Although the Council directed the renegotiation of provisions in five areas, "[n]o changes or modifications were requested in the Scope and Coverage provisions," which included the hot cargo clause. Id. On November 24, the Council approved a revised tentative contract, hammered out between the bargaining agents, and submitted it to the rank and file. Id. at 937. UMWA members ratified the agreement through a lawful procedure and, on December 6, 1974, terminated their strike activities against companies that had executed the new contract. Id.
 
 
 25
 The district court held that the causal effect of the hot cargo clause extended to December 6, 1974, because of the uncertainty of ratification. See id. at 940. It is true that "an illegal object [can] give[ ] such momentum to a strike that the effects of the wrongful conduct last beyond the time when the Union renounces the illegal object and confines its demands to lawful purposes." Frito-Lay, 623 F.2d at 1363. When "the unlawful purpose of the strike [is] effectively abandoned," however, the union is not liable for damages caused by the strike thereafter. Id. Capping liability at the point when the unlawful purpose is effectively abandoned encourages settlement of labor disputes, and also comports with "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own," NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). When the parties agreed to the first tentative contract--including the hot cargo clause (which was not renegotiated)--on November 13, the UMWA's pursuit of the illegal object clearly ceased.[12] Therefore, we will reverse that part of the district court's judgment that the hot cargo clause materially contributed to maintenance of the strike beyond November 13.
 
 C.
 
 26
 The UMWA also contends the hot cargo clause was not a substantial cause for calling and maintaining the WPCHA strike from November 12 to December 6.[13] According to the UMWA, Henderson's damages resulted from a separate, legal strike by its own employees because of its membership in the WPCHA. The haulers, however, maintain the law of the case bars separate consideration of the hot cargo clause's causal impact on the WPCHA strike. We agree with the haulers.
 
 
 27
 As we have noted, we directed our mandate to causation of the BCOA strike. Feather, 711 F.2d at 538. The issue we addressed was causation of the BCOA strike. Id. at 535-36 ("[T]he UMWA argues that an award covering the BCOA strike is improper because its unlawful conduct did not cause the damages incurred during that time.") After clarifying that the UMWA may be liable for losses sustained during the BCOA strike, we conditioned availability of damages for that strike on proof of causation. Id. at 537 ("Our affirmance of the Union's section 8(B)(4) liability for the period of the BCOA strike does not mandate a conclusion that the plaintiffs are entitled to recover damages under section 303 for all losses that might be attributable to that strike, regardless of causation.") In conclusion, we emphasized that the remand order focused on causation of the BCOA strike. Id. at 538 ("Consequently, we believe that the district court, or the magistrate, must be given an opportunity to consider the matter de novo and to take whatever additional evidence is necessary to determine whether the hot cargo clause materially contributed to the decisions to call or maintain the BCOA strike.") Thus, the law of the case bars separate consideration of the clause's causal effect on the WPCHA strike. Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); Cowgill v. Raymark Indus., Inc., 832 F.2d 798, 802 (3d Cir.1987).
 
 
 28
 Nonetheless, UMWA argues that we preserved this issue in a footnote: "If the strike is found to have occurred in distinct phases, with separate causes for the different periods of the work stoppage, the hot cargo clause must be determined to be a substantial factor for each period in which damages are awarded."[14] 711 F.2d at 538 n. 10. Assuming we did not preclude separate consideration of this issue,[15] the UMWA argues, "If the Unions were engaged in a legitimate economic strike against [WPCHA] employers ..., then they would have been idled regardless of the BCOA strike and damages are not awardable unless the illegal clause was a material cause of [the WPCHA] strike[ ]." The hot cargo clause could not have caused the WPCHA strike, the UMWA continues, because it "was not even proposed to the WPCHA until after December 6...."
 
 
 29
 The UMWA's argument is not convincing. Although the BCOA and WPCHA strikes had separate negotiating histories and the industry bargaining agents sought different objectives,[16] we believe the two strikes cannot be viewed in isolation.[17] Whether negotiating with the BCOA or the WPCHA, it is clear the UMWA considered the aggrandizement of jurisdiction over haulage subcontracting a top priority.[18] Because it sought this goal from the BCOA first is not important here. Our determination that the hot cargo clause materially contributed to calling the BCOA strike but did not substantially cause its maintenance after November 13 controls.[19]
 
 III.
 
 30
 In remanding the question of agency, we issued the following directive:
 
 
 31
 [T]here was no finding that any level of the UMWA authorized or in any way supported the individuals who threatened the Hannas. Thus, on this record none of the Union entities[ ] may be held responsible for that conduct. Accordingly, the matter will be remanded so that the issue of agency can be determined under the standards set forth in Kerry Coal and Carbon Fuel.
 
 
 32
 Feather, 711 F.2d at 539. On remand, the district court referred the matter to a Special Master. Feathers, 621 F.Supp. at 928 n. 3. In a report adopted by the district court, the Special Master found it unnecessary to address the issue, concluding that we did not require an "agency showing ... for those activities which were a part of the strike itself," 1258a, but remanded a single agency issue--authorization of threats at the H & H garage--that was subsequently "withdrawn" by the haulers, 1259a. Therefore, without making any findings on agency,[20] the Special Master awarded damages to H & H for injuries sustained "as a result of the strike by defendants from November 12, 1974 through March 1975." 1261a. The UMWA challenges the decision and contends that findings on agency are required. We agree.
 
 
 33
 According to the haulers, the law of the case bars consideration of the agency issue on damages from the BCOA strike. The haulers' argument rests on several statements made by the courts in this matter. In the damages section of our first opinion, we made the following statement:
 
 
 34
 If, on remand, the magistrate ascertains that the hot cargo clause was a substantial factor causing the strike, H & H is entitled to recover for losses attributable to the strike. Of course, injury caused by the threats made at the H & H garage is compensable only if the magistrate finds both agency and causation.
 
 
 35
 Feather, 711 F.2d at 539. Relying on the phrase "individuals who threatened the Hannas" in our agency mandate, the district court referred "the remaining agency issue" to the Special Master. Feather, 621 F.Supp. at 928 n. 3. The Special Master, in turn, relying on the district court's reference as well as the highlighted statements (and others), 1252a, 1254a-1261a, concluded that we "remanded as to causation regarding damages attributable to the strike, and as to agency and causation regarding the garage incident." 1260a.
 
 
 36
 Despite these statements, we did not remand so narrow and specific an agency issue. We mandated a determination on the entire issue of liability in the H & H case.[21] The language cited by the haulers refers to a different issue, that is, the UMWA's liability to non-union haulers with non-union customers for "efforts to obtain and enforce the hot cargo agreement." Feather, 711 F.2d at 539.[22]
 
 
 37
 More importantly, as a matter of law, we could not have remanded a single agency issue. In this case, the UMWA may not be held liable for its members' illegal secondary picketing of non-union facilities during a national BCOA strike authorized by the International unless they were acting as its agents. See C & K Coal Co. v. United Mine Workers of America, 704 F.2d 690 (3d Cir.1983); Kerry Coal Co. v. United Mine Workers of America, 637 F.2d 957 (3d Cir.), cert. denied, 454 U.S. 823, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981). Section 301(b) provides that unions shall be liable for the illegal acts of their agents. 29 U.S.C. Sec. 185(b) (1982). In making the agency determination, "the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. Sec. 185(e) (1982). Common law agency principles govern. Carbon Fuel Co. v. United Mine Workers of America, 444 U.S. 212, 216-17, 100 S.Ct. 410, 413-14, 62 L.Ed.2d 394 (1979); C & K Coal, 704 F.2d at 695. Merely calling a strike, thereby giving members time to engage in illegal secondary activities, is not enough to inculpate a union. Feather, 711 F.2d at 539; cf. C & K Coal, 704 F.2d at 694-99; Kerry Coal, 637 F.2d at 960-64. The union must have "instigated, supported, ratified or encouraged the activity complained of." Kerry Coal, 637 F.2d at 963; see Carbon Fuel, 444 U.S. at 216-18, 100 S.Ct. at 413-14; C & K Coal, 704 F.2d at 695-99. A "separate analysis" must be made for the International, the Districts and the Locals. Kerry Coal, 637 F.2d at 962; accord C & K Coal, 704 F.2d at 695. Here, the illegal acts of the members were not confined to incidents at the H & H garage but included activities at its coal and power company customers. No division of the union can be held liable for damages caused to H & H by UMWA member disruption of its coal and power company customers absent an agency showing. Therefore, on this issue we will reverse and remand for findings consistent with this opinion.
 
 IV.
 
 38
 We conclude the hot cargo clause materially contributed to the UMWA's calling and maintenance of the BCOA strike from November 12 through November 13. Consequently, Henderson is entitled to damages for losses sustained in this period. H & H, however, may only recover damages if it demonstrates that the UMWA "authorized, supported, ratified, or encouraged" the member activities that disrupted the work of its coal and power company customers. Therefore, we will affirm in part, reverse in part and remand for proceedings consistent with this opinion.
 
 
 39
 Each side to bear its own costs.
 
 
 40
 GREENBERG, Circuit Judge, concurring in part and dissenting in part:
 
 
 41
 I join in the opinion of the court in this complex matter except for Part II B 2, at 967 through 968. The court holds that when "the parties agreed to the first tentative contract--including the hot cargo clause (which was not renegotiated)--on November 13, the UMWA's pursuit of the illegal object clearly ceased." At 968. While I will accept that statement as accurate I cannot understand how it can be the basis to limit liability for the period of the strike to November 13.
 
 
 42
 The court recognizes that the hot cargo clause was a substantial cause of the strike. We previously pointed out that the ratification process would take a minimum of eight days and the contract was to expire on November 12, 1974. Feather v. United Mine Workers of America, 711 F.2d 530, 532-33 (3d Cir.1983). Accordingly, even if the only item in dispute on November 13, 1974, was the hot cargo clause the strike was certain to be continued for at least eight days after that date. In the circumstances the losses attributable to the maintenance of the strike during this minimum period for ratification were surely an inevitable consequence of the unlawful objective of the strike.
 
 
 43
 The court attempts to avoid the foregoing result by indicating that the ratification period does not extend "the strike maintenance effect of the union's efforts to obtain the hot cargo clause" because "our concern is whether the illegal demand was a substantial factor maintaining the strike, notwithstanding legitimate reasons may also have contributed." At 968, footnote 12. While this is undoubtedly true, the reasoning of the court should lead to a different result as the consequences of the illegal demand, even if the only matter in issue, could not have been dissipated until a contract addressing that demand was ratified. Thus, the court would be justified in terminating the damages for the period of the strike at November 13 only if on that day work could have been resumed. However, even if the hot cargo agreement had been the only disputed issue, the strike would have continued for at least eight days after the tentative agreement had been reached. Thus, in the very words of the court "the illegal demand was a substantial factor maintaining the strike" for eight days after November 13.
 
 
 
 [1]
 Feather v. United Mine Workers of America, 494 F.Supp. 701 (W.D.Pa.1980), aff'd in part and vacated and remanded in part, 711 F.2d 530 (3d Cir.1983), on remand, 621 F.Supp. 926 (W.D.Pa.1985)
 
 
 [2]
 The challenged clause provided:
 Article II: Scope and Coverage
 Section (g)--Contracting and Subcontracting.
 (1) Transportation of Coal--The transportation of coal as defined in paragraph (a) may be contracted out only to a contractor employing members of the UMWA under this Agreement and only where contracting out such work is consistent with the prior practice and custom of the employer.
 
 
 [3]
 At the end of December, the UMWA ceased striking and both sides resumed negotiations. After thirty days, the talks fell apart and the UMWA resumed the strike, continuing until the WPCHA haulers signed the new agreement
 
 
 [4]
 Two haulers are parties to this appeal. Paul Henderson Trucking (Henderson), a member of the WPCHA whose employees were all members of the UMWA, hauled exclusively from BCOA mines. Because all BCOA mines were idled, non-signatory truckers who hauled coal from BCOA mines [like Henderson] had no work to perform. Henderson seeks damages for losses suffered from November 12 to December 6. H & H Hauling (H & H), an independent hauler whose employees were not members of the UMWA, hauled exclusively from non-union mines. H & H's attempts to continue work during the strike were thwarted by the activities of roving UMWA pickets, who threatened H & H employees at its garage and intimidated its coal and power company customers. "Following the ratification of the [new] agreement," according to the UMWA, "the roving picketing activities at the Hanna garage and their customers' mines and power plants ceased." Nonetheless, H & H seeks damages for losses suffered from November 12, 1974, through the Spring of 1975. We have already determined that the "entire downturn" experienced by H & H during this period "was attributable to the [BCOA] strike." Feather, 711 F.2d at 539
 
 
 [5]
 A "hot cargo" clause is an agreement between an employer and a union that "applies pressure on [the] employer, directly or indirectly, to require him to cease doing business with a third party in order to persuade the third party to accede to the union's objectives." Lewis v. Seanor Coal Co., 382 F.2d 437, 440 (3d Cir.1967), cert. denied, 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137 (1968)
 
 
 [6]
 The district court had jurisdiction under Sec. 303 of the LMRA, 29 U.S.C. Sec. 187 (1982)
 
 
 [7]
 "Prior to 1974, the [collective bargaining agreement] had not contained an express work jurisdiction clause which defined the overall scope of the UMWA jurisdiction." Feathers, 621 F.Supp. at 933. On June 14, 1974, a UMWA official summarized the view of participants in the union's thirteen district collective bargaining conferences: "In non-economic areas, ... there are generally very strong feelings on ... elimination of subcontracting, especially ... contract haulage." Id. at 930; see id. at 933
 
 
 [8]
 On September 3, the UMWA's initial proposal emphasized the importance of Article II, and specifically stated that "subcontracting of unit work [should] be absolutely prohibited" and that the work jurisdiction section should be redrafted to make clear that "the hauling of coal from the mine site ... shall be performed solely by members of the UMWA employed by the mine owner or operator." Feathers, 621 F.Supp. at 934
 
 
 [9]
 On September 10, UMWA negotiators--Chip Yablonski (JY) and Rick Bank (RB)--reaffirmed their desire to eliminate haulage subcontracting, because it was assertedly within the UMWA's work jurisdiction, but softened their position:
 WH: Subleasing and Subcontracting and Work Jurisdiction are pretty much the same thing. We've contracted trucking historically. How would that be viewed under your proposal?
 JY: It would be included in our jurisdiction.
 WH: Can you say that the applicability of the subcontracting clause would be selective?
 JY: We'd start from a blanket position and hear your objections and ideas.
 GF: This would prevent independent contract hauling?
 RB: Yes.
 Feathers, 621 F.Supp. at 931.
 
 
 [10]
 On November 14, three UMWA officials, reflecting on the tentative contract, noted the significance of gains in this area. Feathers, 621 F.Supp. at 936-37
 
 
 [11]
 On November 4, the strike became technically inevitable because members could not work without a contract and ratification required eight days. Feather, 711 F.2d at 532. Proposal of the illegal hot cargo clause after this date, however, did not immunize the strike from the causal effects of the clause. Under Sec. 303(b), "more than one factor can be a substantial cause and no single factor need be the sole causative element." Frito-Lay, Inc. v. Local 137, Int'l Bhd. of Teamsters, 623 F.2d 1354, 1363 (9th Cir.), cert. denied, 449 U.S. 1013 & 1112, 101 S.Ct. 571 & 922, 66 L.Ed.2d 472 & 841 (1980). As long as the illegal object materially contributes to the decision to strike, the UMWA may be liable despite the impetus of legal demands. Feather, 711 F.2d at 538
 
 
 [12]
 Nor does the eight-day ratification procedure act to extend the strike maintenance effect of the union's efforts to obtain the hot cargo clause. As we noted with regard to calling the strike, our concern is whether the illegal demand was a substantial factor maintaining the strike, notwithstanding legitimate reasons may also have contributed
 We also note that we are not here concerned with a situation where the delay in arriving at an agreement, thus delaying the commencement time for ratification, was the result of an illegal demand by a union that was one of the issues being negotiated up to the time agreement was reached.
 
 
 [13]
 The UMWA has previously admitted liability for seeking to enforce the hot cargo clause against Henderson and other haulers after the BCOA strike ended, December 6. Feather, 711 F.2d at 534. In its initial appeal to this Court, the UMWA challenged its liability for damages incurred during the BCOA strike, arguing that the district court did not find it liable for seeking to obtain the hot cargo clause and, in any case, that "its unlawful conduct did not cause the damages incurred during that time." Id. at 535-36. Therefore, because the UMWA has not raised the causation issue with respect to damages suffered after the BCOA strike, we do not address that issue here
 
 
 [14]
 Contrary to UMWA's contention, this footnote did not require the district court "to separately consider the distinct collective bargaining history of the WPCHA strike."
 
 
 [15]
 We also question the UMWA's construction of the term "phases" to denote simultaneous rather than consecutive strikes
 
 
 [16]
 The WPCHA's sole proposal prior to December 6 concerned compensation of drivers, not haulage subcontracting
 
 
 [17]
 Assuming the strikes could be viewed separately, our determination that the hot cargo clause materially contributed to the UMWA's decision to call the BCOA strike and maintain it through November 13 moots consideration of the WPCHA strike. Because Henderson's sole customer was a member of the BCOA, Henderson would have suffered the same damages regardless of any WPCHA strike
 
 
 [18]
 Consequently, we reject the premise behind UMWA's argument that "[s]imply because Article II(g) involved coal haulers does not by any stretch of the imagination mean that the UMWA sought Article II(g) in its negotiations with the WPCHA." The haulers were the very group targeted by the clause
 
 
 [19]
 Thus, we agree with the UMWA that "this Court did not adopt Mead for the BCOA strike and reject it for the WPCHA strike."
 
 
 [20]
 Nonetheless, the Special Master determined, "Had that threats-at-the-garage claim not been withdrawn, it would not have been sustainable because of the lack of record showing of agency for those threats." 1259a
 
 
 [21]
 As our discussion of the applicable law in the following paragraph makes clear, we could not have insulated the H & H damages award from an agency challenge. Thus, the mandate, which concluded our discussion of this law, had to require an agency determination for all damages resulting from the BCOA strike
 
 
 [22]
 The last paragraph of our damages section concludes, "If, on remand, the magistrate were to determine the agency and substantial cause issues in favor of H & H, damages could be awarded to H & H for this period." Feather, 711 F.2d at 539-40. As the Special Master conceded, this sentence "could be read to require a showing of agency and substantial cause for all of H & H's damage claims." 1260a. Nonetheless, this statement does not control as it was made in the context of whether the damage award was speculative